[Crim. No. 5919. First Dist., Div. One. Aug. 8, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. FRED AVILA, Defendant and Appellant.

Ronald L. Ruiz, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, John T. Murphy and William D. Stein, Deputy Attorneys General, for Plaintiff and Respondent.

SIMS, J.—Defendant, after a court trial, has appealed[1] from a judgment convicting him of two counts of selling marijuana in violation of section 11531 of the Health and Safety Code, and sentencing him to state prison after the denial of his motion for probation.

The People established two sales: one on January 11, 1966, and one on January 24, 1966, each of which was consummated through the intervention of an informer whose identity, if not his perfidy, was well known to the defendant, but was not disclosed in the indictment or the proceedings before the grand jury which led to the charge. Defendant does not deny that he furnished marijuana to a state agent and the informer nor that he took their money. He claims that he was entrapped by the informer for whom he merely did a favor in acting as go-between to secure the marijuana; and that he was denied due process of law because, under the circumstances of this case, in which the prosecution was in communication with the informer up to and including the time of trial, there was an obligation on the prosecution to produce him as a witness.

This case involves the existence and extent of the obligation of the prosecution to facilitate the production of an informer as a witness, and the question of whether on the facts presented the prosecution violated such obligation. (See *People* v. *Kiihoa* (1960) 53 Cal.2d 748 [3 Cal.Rptr. 1, 349 P.2d 673].) It is concluded that there was no obligation on the prosecution to produce the informer; that there was a duty to disclose his identity and whereabouts, as known, and not to impede or interfere with the defendant's right to attempt to secure him as a witness; that the duty of disclosure was fulfilled; and that, under the facts of this case, the trial court's finding that there was no such interference on the part of the prosecution is sustained by the evidence.

### Statement of Facts

The facts concerning the transfer of, and payment for, the marijuana, are not disputed in most particulars. It is, therefore, appropriate to consider the respective relationships of the defendant and the prosecution with the informer. A

---

[1]The notice of appeal was filed June 20, 1966, 11 days after judgment. A report from the Santa Cruz County sheriff's office indicates that the notice of appeal was executed on Friday, June 17, 1966, at approximately 7:30 p.m. and delivered to the jailer, who upon the advice of the district attorney filed the notice together with his report. Filing of a notice with a prison official during the 10-day period is treated as constructive filing. (*People* v. *Dailey* (1959) 175 Cal.App.2d 101, 103-107 [345 P.2d 558].)

chronological summary places his activities, and those of the other parties involved, in proper perspective.

The defendant, a young man, aged 23 at the time of the trial, testified that he had known Ronald Lopez, the informer, 10 or 15 years, and would have included him among his five or six best friends. The members of their respective families were friends and met frequently. He knew that Lopez had been using marijuana for five years, and had also sold it. In fact, during the period from March 1965 until March 1966, the defendant, according to his own testimony, had smoked marijuana with Lopez six or seven times. Lopez allegedly furnished the marijuana.

In January 1965, Lopez married a Pat Robertson, who was 19 at the time of the trial. She testified that she was separated from Lopez and would be eligible for a final decree of divorce August 11, 1966.

During the period from May 1965 to the latter part of July 1965, Lopez was in the Watsonville city jail, where he served as a trusty. Mrs. Lopez testified she visited him frequently in jail, and that during one of these visits she participated in a conversation between Lopez and Gerald Fagundes, a detective with the Watsonville Police Department, in which the three of them discussed the detective's proposal that Lopez work with him to break up a local prostitution ring. The detective indicated Lopez would be compensated every time he assisted. Fagundes denied contacting Lopez while he was in jail. Questioning on cross-examination of Mrs. Lopez indicated that Fagundes, Lopez and others were in fact involved in some conversation on that subject matter, which, despite the questioner's attempts to so establish, the witness did not consider facetious.

Fagundes, who was first called as a witness for the defendant, and subsequently, under circumstances hereinafter set forth, as the court's witness, testified that Lopez, whom he had known about six years, had acknowledged that he had some information about narcotic traffic in the City of Watsonville; that a meeting was arranged with state narcotic agents around the first of September 1965; that for the next six or seven months there was a general investigation in which Lopez participated; and that he never gave Lopez any money, nor, to his knowledge, did any local law enforcement agency do so.

Agent Armenta acknowledged that from August 1965 until sometime in February 1966, a "buy program" was conducted

in the Watsonville area; that he saw Lopez several times a week, possibly every other day during this period; and that Lopez was paid for the expenses he incurred for food, money paid out, and things like that.

Agent Verbrugge, who observed a portion of the activities resulting in defendant's conviction, stated that he and Armenta were introduced to Lopez by Fagundes in September 1965; and that he worked with Lopez and saw him two or three times a week during the buy program.

Field Supervisor Ojeda, who testified for the prosecution concerning the custody of the evidence received on January 24th was thereafter called as a witness by the defendant. He testified that Lopez was paid by Agent Armenta, that he received the agent's vouchers, that Lopez received $5, $10, or possibly $15 at a time for expenses, and that the total did not exceed $100.

According to Mrs. Lopez, at the time her husband was released from jail in July 1965 she was not living with him, but was living in Santa Clara, where she resided for about two months. She came down to Watsonville every weekend, and in August moved in with Lopez at his mother's house for about a week. According to her testimony, Lopez had ample spending money during all this period. He had marijuana in his possession most of the time, smoked it, and on two or three occasions she saw him pass it to others in return for money.

In response to defendant's cross-examination, Agent Armenta testified that at the end of August or first of September 1965, the defendant was first pointed out as an alleged source of supply; that at that time the defendant's brother sent Armenta and Lopez to the defendant's home to purchase marijuana, but that the defendant was not there. He did not know whether Lopez had attempted to make other purchases from defendant. The defendant testified that from November 1965 through February 1966, Lopez persistently importuned him by telephone and in person to secure marijuana to satisfy the informer's habit.

The defendant acknowledged that on January 10th he asked around for marijuana without success; that on the 11th he found a source and told him he would advise him later how much he wanted for his contact; that Lopez telephoned him and, upon being advised of defendant's find, ordered two "cans," and arrangements were made to meet at 4:30 p.m.[2]

---

[2]According to Agent Armenta, who monitored the conversation and made notes at the time, the conversation was as follows: ''The male voice

Lopez and Armenta picked up the defendant at his residence in Watsonville, and drove to a place designated by him. The defendant then left the car with $40 which had been paid to him and subsequently returned with two candy bars (observed), and two cans of marijuana (concealed). Defendant put the marijuana under the passenger side of the front seat where it was subsequently retrieved by the agent, in accordance with the defendant's instructions. The only discrepancies between the agent's account and that of the defendant are with respect to the manner in which Lopez designated the agent when he introduced him to defendant,[3] and the defendant's insistence that all his dealings were with Lopez rather than, as the agent testified, with Armenta. The agent further testified that defendant admitted that he had been smoking marijuana for approximately 13 years, did not believe it was bad and believed alcohol was worse, and that the agent's attempt to haggle over the price was countered with defendant's statement that he had been doing business with his source for a long time and had never been able to get a break in the price.

Defendant testified that after the incident on the 11th there were further calls from Lopez who said his uncle took most of the marijuana; that on January 23d he told Lopez that he "didn't want to get in any more trouble or anything because me and my wife had split up and I wanted to go back with her . . . she didn't want me . . . to mess around with any marijuana"; that Lopez insisted and offered defendant $10 if he would get him some more; that he (defendant) ultimately assented and on the 24th he went downtown keeping an eye open for the source; that the source confronted him and said he had more available; that he met Lopez, who wanted four cans so he could split with his uncle and another

---

said: 'Yah man.' The operator said: 'Freddy, got any weed left?' The other voice said: 'Who's this? The operator replied with his name. The other voice said: 'Yah, how much do you want?' The operator said: 'I thought maybe you could get me a couple of cans.' The other voice said: 'Well, for that you will have to wait till tonight.' The operator said: 'What time?' The other voice said: 'After 4:00 o'clock, about 4:30.' The operator said: 'Where do you want to me to meet you?' The other voice said: 'At my pad.' The operator said: 'Okay. I'll see you around 4:30 or quarter to 5:00.' The other voice: 'Okay.' The operator: 'Anything going on around Salinas?' The other voice: 'Yeah, that's what I hear. I have been real careful lately; haven't been dealing much just getting high and staying cool.' The operator: 'That's the best way. Well, I'll see you around 4:30.' The other voice: 'Okay.' The operator: 'Bye.'"

[3] Armenta said "Eddy," and the defendant quoted Lopez as saying "Uncle John."

friend; that he arranged to meet him in the park at 3 p.m.; and that he then returned to the source, secured the four cans and hid them in his mother's back yard.

The agent and defendant each testified that defendant drove up with a friend and met Lopez and Armenta in the vicinity of the downtown park; that defendant asked Lopez to come with him to get the marijuana, but rejected Armenta's overture to come along, and then told them both to meet him at another park in a few minutes. Defendant went with his friend to get the marijuana, and, according to his version, returned to the rendezvous, observed the purchasers' car, threw the contraband in the weeds, approached the passenger side of the other vehicle, conversed with Lopez, received $80 from him, of which a portion came from Armenta, and then went back downtown and turned the $80 over to his source. Armenta testified to substantially the same transaction, except that he stated that defendant came to the driver's side, conversed with him and received the $80 from him. He retrieved the package, which proved to contain marijuana, from the weeds. Agent Verbrugge, who was covering the operation with Fagundes and Ojeda, corroborated Armenta's testimony that the person who approached Armenta's car came to the driver's side.

Defendant admitted that his source of supply was the same on each occasion, but he refused to name him "because I am scared. Like they say, they are going to get somebody, money to get Ronnie [Lopez]. I don't want them—to have them to get me, too, you know." The court respected the defendant's feelings and did not require him to answer because it might expose him to great bodily harm.

The "buy program" ended sometime around the first week of February 1966. Thereafter, and on or before February 23d, Lopez, Agents Armenta and Verbrugge, Detective Fagundes and officers of the Capitola Police Department were present at a meeting in Capitola. Lopez was arrested by Armenta on one of several outstanding traffic warrants, including one from Monterey County, for driving with a suspended license in violation of section 14601 of the Vehicle Code. These warrants allegedly only came to the attention of the agents on that day. Lopez was delivered to the custody of the Capitola Chief of Police who took him to the Santa Cruz County jail. That was the last occasion on which Armenta saw Lopez, and there is no evidence that Verbrugge ever saw him again.

On February 23d, Lopez was brought to the Monterey County jail in Salinas for traffic violations, and remained there until released on March 3d. Agents Armenta and Verbrugge each denied that Lopez was held in protective custody, and each opined that he would have preferred not to arrest the informer.

On February 25th the grand jury held a hearing and indicted defendant and others; and on March 1st there were mass arrests in which defendant was taken into custody.

On March 3d Detective Fagundes and a lieutenant of the Watsonville Police Department, who were at the district attorney's office in Salinas, were requested to give Lopez a ride back to Watsonville, and did so. Fagundes testified that this was the last time he saw Lopez. He denied that he discussed the informer's future plans, or that he made any arrangements for Lopez to leave the area.

The two agents, the field supervisor, and the detective, each testified that Lopez was told that he might have to testify in proceedings arising out of his activities. No one admitted telling him he would not have to testify. All acknowledged that Lopez had expressed fears for his personal safety. Armenta acknowledged it was possible that he told Lopez he could leave the area after he made the ''buys,'' but the others denied that they ever so advised Lopez.

It was stipulated that defendant's attorney first contacted the district attorney concerning the case on March 15th; that on March 17th a request for the identity and address of the informer was refused; that, as reflected in the record, the defendant moved the court for an order for discovery of this information; that the motion was granted on April 4th; and that on April 9th the defendant's attorney received the district attorney's letter dated April 7th which gave the informer's name, and his last known address as Monterey County jail. Two statements by the prosecution that the letter also divulged Lopez' mother's address in Watsonville, as the address he had given when booked at the jail, were never controverted.

The defendant subsequently testified that on Monday, May 16th, at about 5:30 or 6 p.m., the eve of the trial, he went to Lopez' house (the address of his mother) and was greeted by the wife of Lopez' brother, Sheldon. He then talked to Sheldon who said he did not know where Lopez was, and that he had not seen him. Lopez' mother joined the conversation and said that the last time she heard of Ronnie he was in

Santa Rosa, but she did not know where he was staying, or anything.

On May 17, 1966, the first day of trial, the prosecution produced the testimony of the two agents. the field supervisor, and a laboratory technician to establish the offenses of which the defendant was convicted. The defendant indicated in his cross-examination of Agent Armenta, the People's first witness, that he was going to insist on the production of Lopez. At the conclusion of the case for the prosecution, the defendant moved in the alternative that the prosecution produce Lopez, or that the case be dismissed. The court denied the motion without prejudice to its renewal.

The defendant then called Detective Fagundes who testified generally concerning the introduction of Lopez to the state agents, and their subsequent relationship. Court thereupon adjourned for the day.

From subsequent testimony it appeared that about 8 a.m. on Tuesday May 17th, the first day of the trial, Fagundes had received a phone call at his office from a person indicating he was Lopez.[4] According to Fagundes the voice sounded like that of a fellow officer with whom he had been working until midnight on a burglary case, and the salutation was not one with which Lopez customarily addressed him, so he did not really think it was Lopez. He was busy making an inventory of tools involved in the other case, and told the caller he would call him back. Fagundes testified that he never had a chance to return the call on the 17th before he testified, but did call Lopez back at 6:30 on the morning of the 18th.

At 7:30 p.m. on the 17th, after he testified (or possibly, see fn. 4, *supra*, the 16th), Fagundes received a call from someone purporting to be Lopez. Fagundes testified that he said no more than that he, Fagundes, had to go out.

On the evening of the 17th, after the first day of trial, the defendant, his brother, his attorney, Mrs. Lopez and Mrs. Lopez' younger sister conferred at defendant's mother's home. Lopez' sister-in-law called the Lopez family home between 8 and 8:30 and talked to a person whose voice she, Mrs. Lopez and defendant's brother, all identified as that of the informer. The court sustained the prosecution's objection to questions designed to elicit what Lopez may have said

---

[4]At one point, in a very confused account, Fagundes indicated that the first call was received on Monday the 16th at 7:30 p.m. He ultimately fixed it, in relation to a burglary case, as on the morning of the 17th, and stated that the evening call was on the 17th after he had testified.

about prior conversations he had held with Fagundes.[5] The sister-in-law further testified that she had received a call from Lopez at 3 p.m. on the 17th.

Following this conversation, the defendant, his brother and his attorney went to the judge's home,[6] and then down to Santa Cruz to secure subpoenas for Mrs. Lopez and her sister, who were served, and for Lopez and Fagundes. At 11:30 p.m., defendant's brother attempted to serve Lopez at his mother's home. The door was answered by Sheldon's wife. Sheldon then came to the door and said that Ronald was not there. Lopez' mother came to the door and affirmed that he was not there, and stated that the last time she had heard from her son was two weeks before.

The court's question, "Have you [since receiving the call at 8 a.m. on May 17th] . . . called him back?" and Fagundes' answer, "I called him this [May 18th] morning . . . about 6:30," left the impression there had been no intervening contacts. Fagundes, when examined on behalf of the defendant, first acknowledged and then denied that Lopez had told him on the 17th that the defendant had been to his house on the night of the 16th for the purpose of getting him to testify. The detective admitted that he had told Lopez on the 17th that there was a $500 "contract" on the informer's life, and a similar $500 "contract" on his own life. He insisted that he never instructed Lopez not to testify, and he explained he had not told the judge about this conversation because he had not been asked. When the prosecutor took over the examination, Fagundes for the first time mentioned a call from Lopez at midnight of the night of May 17-18, and attributed the foregoing statements to that call.[7] He testified

[5] Lopez' declarations on the telephone to his sister-in-law and to defendant's brother could not be used to establish the truth of what he may have related Fagundes told him so as to impeach Fagundes, or for the purpose of establishing an attempt to silence the prospective witness. It is conceivable that if pertinent they would be material on the issue of continuing the trial to get the testimony of Lopez. No formal offer of proof was made as to the contents of Lopez' recitals of Fagundes' declarations. At one time defendant's counsel did assert "if we could produce him [Lopez], he would show that he [Fagundes] told him not to testify." However, no motion was made for a continuance.

[6] Apparently, as a result of this visit the judge telephoned the police department and left a message for Fagundes, later received by him, to appear in court again the morning of the 18th. Fagundes denied he was ever advised of the subpoena which ostensibly was left for him at the police department between 11 p.m. and midnight on the 17th.

[7] Here again the witness registered confusion as to whether it was midnight of the 16th or of the 17th, but fixed upon the latter because he was out on the burglary investigation on the night of May 16-17, and because it

he was home in bed asleep when called by a person who identified himself as Lopez. The caller stated that the defendant had been to his house, and discussed the fact that there was a $500 price on the informer and on the detective.

Fagundes further testified that he called Lopez at 6:30 a.m. on the 18th. No testimony was elicited as to the subject matter of this call. The detective further acknowledged that he phoned the district attorney at 7 a.m. on the 18th after receiving word to appear again at the trial, and after he had called Lopez. He denied that he knew that the defendant was seeking Lopez as a witness.

Testimony concerning the foregoing incidents, and defendant's testimony that he was merely an entrapped go-between was received on the second day of trial. Following the testimony of defendant's brother, which revealed that Lopez had talked on the telephone from his mother's house the night before, defendant renewed his motion to dismiss the action for lack of due process of law. The judge, who had then also heard the confused testimony of Fagundes, denied the motion because the defendant had failed to show some active participation of the police department in preventing the defendant from securing the testimony of the informer. Whatever one might think of the activities of Fagundes, his denials supported a finding that he had not told Lopez not to testify. In any event, it was obvious that the police had not spirited Lopez away. The court concluded that he refused to accept service of the subpoena because he feared for his safety, and that the police could not be criticized for telling him that there were threats against him, but would have been subject to criticism if they had failed to warn him. The judge left the way open for renewal of the motion to compel the prosecution to produce the witness if entrapment were shown.

The defendant's brother further testified that he had not seen Lopez since March 1st when he, Frank Avila, had also been arrested; that after March 1st he heard Lopez had skipped town, but had made no effort to determine whether he was at his mother's prior to the preceding night.

Court adjourned on the 18th, following the conclusion of

was received after he testified on the 17th. On the other hand, the witness' admission that Lopez told him the defendant, Freddy Avila (who testified he went on the evening on the 16th) had been to the house and not defendant's brother, Frank Avila (who attempted to serve the subpoena on the night of the 17th), suggests that the call may have been prior to the commencement of the trial on the 17th, despite Fagundes' later statements.

the cross-examination of the defendant. The case proceeded the following morning and both sides rested. No showing was made that the defendant had delivered a subpoena for Lopez to any peace officer for service, nor did defendant seek a continuance to effect service, or an order for service on a concealed witness. (See Code Civ. Proc., § 1988.) Defendant sought and was granted leave to move for a dismissal for lack of due process before the prosecution commenced its opening argument. The court concluded that the police were not secreting Lopez or doing anything to prevent him from being present at the trial, and that, even accepting the defendant's testimony at its face value, it could not see any entrapment whatsoever, because repeated requests were not the persuasion that would convince a man to do something he otherwise would not do.

*Obligation of the Prosecution—Production v. Disclosure*

■ "The prosecution is not required to call any particular witness, nor to put on all the evidence relating to a charge so long as all material evidence bearing thereon is fairly presented in such a manner as to accord to the defendant a fair trial. [Citations.]" (*People* v. *Kiihoa, supra*, 53 Cal.2d 748, 752.) This principle has been generally applied to exonerate the prosecution from any alleged obligation to produce an informer as its witness to a charge which it can establish through other evidence. ( *People* v. *Barone* (1967) 250 Cal.App.2d 776, 780 [58 Cal.Rptr. 783]; *People* v. *Wilson* (1966) 239 Cal.App.2d 358, 366 [48 Cal.Rptr. 638]; *People* v. *Davis* (1965) 238 Cal.App.2d 482, 484 [48 Cal.Rptr. 111]; *People* v. *Fontaine* (1965) 237 Cal.App.2d 320, 327 [46 Cal.Rptr. 855]; as modified 252 Cal.App.2d 73 [60 Cal.Rptr. 325]; *People* v. *Herrera* (1965) 232 Cal.App.2d 561, 563 [43 Cal.Rptr. 14] (overruled on other grounds in *People* v. *Perez* (1965) 62 Cal.2d 769, 776 [44 Cal.Rptr. 326, 401 P.2d 934]); *People* v. *Herrera* (1965) 232 Cal.App.2d 558, 560 [43 Cal.Rptr. 12] (overruled on other grounds in *People* v. *Perez, supra*, 62 Cal.2d 769, 776); *People* v. *Mort* (1963) 214 Cal.App.2d 596, 600 [29 Cal.Rptr. 650]; *People* v. *Harris* (1963) 213 Cal.App.2d 365, 369-370 [28 Cal.Rptr. 766]; *People* v. *Galvan* (1962) 208 Cal.App.2d 443, 450 [25 Cal.Rptr. 128]; *People* v. *Ruiz* (1962) 205 Cal.App.2d 674, 678 [23 Cal.Rptr. 236] (see same case (1964) 228 Cal.App.2d 703, 706 [39 Cal.Rptr. 641]); *People* v. *Rodriguez* (1962) 202 Cal.App.2d 191, 195 [20 Cal.Rptr. 556] (overruled on other grounds in *Kellett* v. *Superior Court* (1966) 63 Cal.2d 822,

826 [48 Cal.Rptr. 366, 409 P.2d 206]); *People* v. *Castedy* (1961) 194 Cal.App.2d 763, 769 [15 Cal.Rptr. 413]; *People* v. *McKoy* (1961) 193 Cal.App.2d 104, 108 [13 Cal.Rptr. 809]; *People* v. *Render* (1960) 181 Cal.App.2d 190, 195 [5 Cal.Rptr. 236].)

In *Kiihoa* the court recognized that when the confidential informant initiated a transaction in which he and a deputy sheriff purchased heroin, ostensibly from a known narcotics peddler, through the defendant as an intermediary, the informant was a material witness. There was, therefore, no privilege to refuse to identify the informer, and the matter was governed by the rule "that the prosecution is required to disclose the informer's name or dismiss the case, on proper application by the defendant to the court." (53 Cal.2d at p. 751; and see *People* v. *Perez, supra,* 62 Cal.2d 769, 773; *People* v. *Durazo* (1959) 52 Cal.2d 354, 356 [340 P.2d 594, 76 A.L.R.2d 257]; *People* v. *Williams* (1958) 51 Cal.2d 355, 357-358, 358-360 [333 P.2d 19]; *Priestly* v. *Superior Court* (1958) 50 Cal.2d 812, 816-819 [330 P.2d 39]; *People* v. *McShann* (1958) 50 Cal.2d 802, 806-811 [330 P.2d 33]; *Roviaro* v. *United States* (1957) 353 U.S. 53, 58-65 [1 L.Ed.2d 639, 643-647, 77 S.Ct. 623].)[8]

The prosecution had met the requirements of disclosure by voluntarily disclosing the informant's identity and his last known whereabouts. The trial court denied Kiihoa's motion that it order the prosecution to produce him. (53 Cal.2d at p. 751.) It was admitted, however, that the prosecution had released the accused after an earlier arrest for the offense charged, and deferred rearresting and prosecuting him until the informer had departed from the state. The court concluded that the admitted purposeful delay in bringing the defendant to trial "would seem to point unerringly to the conclusion that the state sought to circumvent, if not to stultify, the reason for the rule requring disclosure. The procedure resorted to in the instant case manifestly denied the defendant a fair trial just as effectively as if the informer had never been identified." (53 Cal.2d at p. 753.)

---

[8]The question of disclosure of the identity of an informer "who is not a material witness to the guilt or innocence of the accused of the offense charged" is now controlled by section 1042, subdivision (c), of the Evidence Code. (See Code Civ. Proc., former § 1881.1; Stats. 1965, ch. 937, §§ 1-3, pp. 2549-2550; *Martin* v. *Superior Court* (1967) 66 Cal.2d 257 [57 Cal.Rptr. 351, 424 P.2d 935] and *McCray* v. *Illinois* (1967) 386 U.S. 300 [18 L.Ed.2d 62, 87 S.Ct. 1056].)

In this case the testimony of the informer would be material, relevant and competent. Not only was he a witness of and participant in the two transactions which gave rise to the charges involved, but also, according to the testimony of the defendant, he was the one who could confirm or deny that he made the alleged persistent attempts to induce the defendant to secure marijuana for him. ■ It is recognized that a person who may give evidence on the issue of entrapment is one whose identity must be disclosed as a material witness. (See *People* v. *McShann, supra,* 50 Cal.2d 802, 810; and *Roviaro* v. *United States, supra,* 353 U.S. 53, 64 [1 L.Ed.2d 639, 647].) In *Velarde-Villarreal* v. *United States* (9th Cir. 1965) 354 F.2d 9, under a similar claim of persuasion, the court observed: "It would appear that Margarito might have been an important witness for the defendant-appellant had he been made available. Had Margarito been called, his testimony might possibly have served to corroborate appellant's claim of entrapment. See *Sherman* v. *United States,* 356 U.S. 369 [2 L.Ed.2d 848, 78 S.Ct. 819]." (354 F.2d at p. 11.)

Here the prosecution met the burden of disclosure over a month before the trial when it furnished the information requested by defendant's motion. It is also noted that if the defendant's testimony, that he only engaged in securing marijuana because he was induced to do so by his friend Lopez, is to be believed, he had cause to learn of the perfidy of his friend when he received a copy of the indictment at his arraignment. This case does not in reality involve the question of divulging the identity of an unknown informer, nor his whereabouts.

No question has been raised, as in *Kiihoa,* as to the delay in arresting or in bringing the defendant to trial. In fact, the record shows that the informer was physically available as a witness at the time of trial. ■ In any event, delay in arresting and charging the accused, which results in the unavailability of the informer, is not a denial of due process of law if the facts "do not indicate that the prosecution had any intent to cause the absence of the informer but that the delay was for the mere purpose of more efficient law enforcement." (*People* v. *Castedy, supra,* 194 Cal.App.2d 763, 770; and see pp. 767-770; accord: *People* v. *Wilson, supra,* 239 Cal.App.2d 358, 365; *People* v. *Gilmore* (1965) 239 Cal.App. 2d 125, 128-130 [48 Cal.Rptr. 449]; *People* v. *Fontaine, supra,* 237 Cal.App2d 320, 324-325; *People* v. *Galvan, supra,* 208 Cal.App.2d 443, 447; *People* v. *Lugo* (1962) 203 Cal.App.2d

772, 778 [21 Cal.Rptr. 871]; *People* v. *McKoy, supra,* 193 Cal.App.2d 104, 110; *People* v. *Givens* (1961) 191 Cal.App.2d 834, 839-840 [13 Cal.Rptr. 157]; and see *People* v. *DeLosa* (1960) 184 Cal.App.2d 681, 683-684 [7 Cal.Rptr. 753].)

Defendant insists the prosecution had the duty not only to divulge the identity and whereabouts of the informer, but also to produce him in court. In *Kiihoa,* the reversal indicates that under the circumstances the court erred in failing to grant the defendant's motion that the informer be produced. (See 53 Cal.2d at p. 751.)[9] In the following cases the court upheld a denial of the defendant's demand or motion that the prosecution produce an informer, when the identity and whereabouts of the informer had been disclosed to the best of the prosecution's knowledge. (*People* v. *Barone, supra,* 250 Cal. App.2d 776, 781; *People* v. *Wilson, supra,* 239 Cal.App.2d 358, 366; *People* v. *Gilmore, supra,* 239 Cal.App.2d 125, 133-134; *People* v. *Davis, supra,* 238 Cal.App.2d 482, 483, 485; *People* v. *Fontaine, supra,* 237 Cal.App.2d 320, 327-328; *People* v. *Render, supra,* 181 Cal.App.2d 190, 195.)

"In the absence of evidence to show that the People sought to suppress the testimony of the informer or bring about his absence or disappearance, defendant cannot predicate error on the People's failure to produce him. [Citations.]" (*People* v. *White* (1966) 239 Cal.App.2d 355, 357-358 [48 Cal.Rptr. 756]; *People* v. *Brooks* (1965) 234 Cal.App. 2d 662, 678 [44 Cal.Rptr. 661]; *People* v. *Herrera, supra,* 232 Cal.App.2d 561, 563; *People* v. *Herrera, supra,* 232 Cal.App. 2d 558, 560; *People* v. *Galvan, supra,* 208 Cal.App.2d 443, 450; *People* v. *Ruiz, supra,* 205 Cal.App.2d 674, 679; *People* v. *Rodriquez, supra,* 202 Cal.App.2d 191, 195.)

"Defendant cannot avoid the consequences of his failure to seek out the informer when he had the opportunity to do so, and likewise he cannot shift to the prosecution the burden of calling the informer as a witness for the defense." (*People* v. *Galvan, supra,* 208 Cal.App.2d 443, 450; accord: *People* v. *White, supra,* 239 Cal.App.2d 355, 357; *People* v. *Fontaine, supra,* 237 Cal.App.2d 320, 326; *People* v. *Rodriguez, supra,* 202 Cal.App.2d 191, 195; *People* v. *Sauceda* (1962) 199 Cal.App.2d 47, 56-57 [18 Cal.Rptr. 452]; *People* v.

[9]On retrial the court denied the defendant's motion to dismiss the action because the state conduct described in the first appeal had denied him a speedy trial. Trial was had, the informer was produced and testified against the defendant, the defendant was convicted, and his conviction was affirmed. (*People* v. *Kiihoa* (1962) 209 Cal.App.2d 196 [25 Cal.Rptr. 813].)

*Blair* (1961) 195 Cal.App.2d 1, 9-10 [15 Cal.Rptr. 533]; *People* v. *Render, supra*, 181 Cal.App.2d 190, 195, 196; *People* v. *Scott* (1959) 170 Cal.App.2d 446, 454 [339 P.2d 162].)

In *Velarde-Villarreal* v. *United States, supra*, the informer, as in this case, allegedly was a long-time acquaintance of the defendant whose persuasions allegedly induced the defendant to participate in the transactions of which he was convicted. Three agents testified that they did not know his whereabouts at the time of the trial. There was also testimony which indicated that an agent might have advised the informer to leave the country for the purpose of denying the defense access to him as a witness. Two judges concluded: "We therefore hold that the cause should be and it is remanded to the trial court for the purpose of holding a further hearing at which the Government shall be given the opportunity of proving if such be the case that it was genuinely unable through reasonable efforts to produce Margarito and also, if such be the case, that the Government did not take steps to see to it that Margarito would be or become unavailable as a witness. The burden of proving these things should be on the Government. Failure to make such proof will call for a new trial. This procedure is similar to that called for in *Remmer* v. *United States*, 347 U.S. 227 [98 L.Ed. 654, 74 S.Ct. 450]. Should the Government sustain its burden in these respects, then appellant should be denied relief. For if the Government was truly unable by reasonable efforts to produce Margarito, and was not responsible for his unavailability, the judgment of guilt must be affirmed." (354 F.2d at p. 13.) The third judge stated: "Under all the unusual circumstances of the case at bar, I would hold that the Government, upon the request of the defendant, which here was timely made, was obliged either to produce its agent Margarito as a witness or to obtain and supply to the appellant such information as would enable appellant to bring him before the court." (*Id.*, pp. 15-16; fn. omitted.)[10]

Defendant's attempts to unqualifiedly apply the foregoing principles in support of his proposition that the prosecution

[10]In *Tapia-Corona* v. *United States* (9th Cir. 1966) 369 F.2d 366, the view expressed by the majority in *Velarde-Villarreal* was reiterated by a unanimous court. It has also been stated that "Roviaro v. United States . . . requires only that the Government identify its informant; the duty does not extend to production, [citations]." (*United States* v. *Cimino* (2d Cir. 1963) 321 F.2d 509, 512; and see *Alvarez* v. *United States* (9th Cir. 1960) 282 F.2d 435, 439; and *Williams* v. *United States* (9th Cir. 1959) 273 F.2d 781, 795-796, cert. den. 362 U.S. 951 [4 L.Ed.2d 868, 80 S.Ct. 862].)

must produce,[11] as well as divulge the identity and whereabouts of, the informer is thwarted by the long line of precedents to the contrary in this state, and by the fact that in this case, at the time of trial, the informer was as available to the defense as he was to the prosecution.

*Obligation of the Prosecution—Suppression or Interference*

Defendant further contends that he was denied due process of a fair trial because the prosecution in effect suppressed evidence which might have been favorable to him. This principle was noted in *Kiihoa* in the following passage: "The intentional suppression of material evidence by the state would, of course, be a denial of a fair trial and due process. This could, in some circumstances, be manifest by a failure of the prosecution to call certain witnesses. [Citations.] Such a denial would likewise exist where the prosecution was allowed to control the course of proceedings in a manner which would prevent the accused from presenting material evidence. The rule requiring the disclosure of the identity of an alleged informer is designed to prevent such injustices. The rationale of that rule is that the defendant, through the testimony of the informer when his identity is made known, might be able to rebut a material element of the prosecution's case and thereby prove his innocence. The denial by the prosecution of an opportunity for the defendant to seek out the informer and to defend by these means, where the testimony of the informer would be material to the issues, is unfair and oppressive to the defendant, and deprives him of due process of law. [Citations.]" (53 Cal.2d at p. 752; and see *People* v.

---

[11]It has been suggested that the failure to call the informer in those cases where the informer is quite obviously better able to testify to the facts in issue than are alternative government witnesses may raise "a presumption that the informer's testimony would have been unfavorable to the Government's case." (Waterman, Circuit Judge, concurring in part and dissenting in part, *United States* v. *Cimino* (2d Cir. 1963) 321 F.2d 509, at pp. 515, 517.) In this state, in the absence of an established duty to produce, it has generally been acknowledged that no adverse inference should be drawn (cf. Evid. Code, §§ 412, 413; Code Civ. Proc., former § 1963, subds. 5 and 6, and former § 2061, subds. 6 and 7); and that the situation is governed by the principle that neither side "is re quired to call as witnesses all persons who are shown to have been present at any of the events involved in the evidence, or who may appear to have some knowledge of the matters in question in this trial; . . ." (CALJIC No. 23; see *People* v. *Adams* (1967) 249 Cal.App.2d 501, 507-508 [57 Cal.Rptr. 389]; *People* v. *Harris* (1963) 213 Cal.App.2d 365, 369 [28 Cal.Rptr. 766]; *People* v. *Fontaine* (1965) 237 Cal.App.2d 320, 332-333 [46 Cal.Rptr. 855]; *People* v. *Galvan* (1962) 208 Cal.App.2d 443, 449-450 [25 Cal.Rptr. 128]; *People* v. *Lugo* (1962) 203 Cal.App. 2d 772, 778 [21 Cal.Rptr. 871].)

*Galvan, supra,* 208 Cal.App.2d 443, 450; *People* v. *McKoy, supra,* 193 Cal.App.2d 104, 109; *People* v. *Render, supra,* 181 Cal.App.2d 190, 195-196.)

██ ''Without question the intentional suppression of material evidence by a district attorney can result in the denial of a fair trial, and when it does, suppression amounts to a denial of due process. [Citing *Kiihoa*] . . . ██ [W]hether the district attorney's failure to call a particular witness constitutes a suppression of evidence necessarily depends upon the state of the evidence in the case, measured against the facts to which the uncalled witness could testify.'' (*People* v. *Mort, supra,* 214 Cal.App.2d 596, 600.)

In *Kiihoa* the court discussed the question of whether there was any state action which deprived the defendant of due process of law. The court recognized ''that the police did not arrange for [the informant's] absence.'' It observed: ''The critical question, however, is not necessarily one of improper conduct in bringing about [his] absence, but rather, whether the defendant's conviction resulted from some form of trial in which his essential rights were disregarded or denied. We are persuaded that the circumstances surrounding this prosecution affected and militated against the defendant's right to a fair and impartial trial.'' (53 Cal.2d at p. 753.) The fact that state action, purposefully delaying the trial, was involved is manifest from the concluding paragraph of the opinion. ''It is not intended to hold that the mere unavailability of a material witness would necessarily result in a denial of due process in every case. We do not reach that question where, as here, the deprivation of due process was admittedly occasioned by state action.'' (53 Cal.2d at p. 754.)

*Evidence on Suppression or Interference*

In *People* v. *Sauceda, supra,* 199 Cal.App.2d 47, the court reviewed five prior cases and remarked: ''In all of these cases, as in *People* v. *Kiihoa, supra,* the suspect was not arrested until after the informant had left the jurisdiction. Yet the cases have uniformly held that in the void of specific testimony that the police encouraged the informer to disappear [as was the case in *Kiihoa*], the courts cannot infer improper motives or activities on the part of the officers, but must presume that the officers regularly and lawfully performed their duties (*People* v. *Farrara,* 46 Cal.2d 265 [294 P.2d 21]), as well as that the payment for and termination of an informer's employment is not in and of itself 'encouraging him to

disappear.' (*People* v. *Wilburn, supra* [(1961) 195 Cal.App. 2d 702, 705 [16 Cal.Rptr. 97]].) Nor do we think that the fact that the informer here was a parolee who had to receive special permission from the authorities to leave the state constituted an encouragement of his disappearance.'' (199 Cal.App. 2d at p. 56; accord: *People* v. *Barone, supra,* 250 Cal.App.2d 776, 780; *People* v. *Wilson, supra,* 239 Cal.App.2d 358, 365; *People* v. *Gilmore, supra,* 239 Cal.App.2d 125, 134; *People* v. *Davis, supra,* 238 Cal.App.2d 482, 484; *People* v. *Harris, supra,* 213 Cal.App.2d 365, 369; *People* v. *Galvan, supra,* 208 Cal.App.2d 443, 448.)

■ Defendant contends that the testimony concerning the telephone calls between Detective Fagundes and Lopez gives rise to the inference that there was state action to induce the informer not to testify, as prohibited by both state and federal law. It may be assumed that the admitted content of the calls, the circumstances under which they were made and received, and the manner in which Fagundes testified would be sufficient to sustain a finding contrary to his express denials that he told the informer not to testify. The trial judge who heard and observed the witness concluded, however, that the informer was personally avoiding service of process, not because of the action of the detective, but because of personal fear for his safety.[12] The fact that each party to the conversation discussed what was apparently known to both, that there was a price on the life of each, does not require a contrary conclusion.

In *Kiihoa* the court recognized that the prosecution's motive in protecting the informer from the threats of reprisal was praiseworthy. It concluded, however: ''Such motives and purposes cannot prevail when, as here, they inevitably result, intentionally or unintentionally, in depriving the defendant of a fair trial.'' (53 Cal.2d at p. 754.) The opinion cites *Roviaro* v. *United States, supra,* 353 U.S. 53, wherein the court stated: ''We believe that no fixed rule with respect to

---

[12]After Fagundes testified, the defendant's brother testified that he was unsuccessful in his attempt to serve the subpoena, and that earlier in the evening he had heard Lopez' voice on the telephone. The defendant, after objection was sustained to a question designed to elicit what the brother had heard Lopez say with respect to what Fagundes had told him, renewed his motion to dismiss. The court observed: ''[I]t is understandable how an informer would be afraid. . . . Now, you have to show something, active participation of the police department. . . . [I]f the police have nothing to do with his being spirited away or anything of this kind, then the fact that he secretes himself . . . may be unfortunate, but it is understandable.''

disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.'' (353 U.S. at p. 62 [1 L.Ed.2d at p. 646].)

In *People* v. *Perez* (1962) 58 Cal.2d 229 [23 Cal.Rptr. 569, 373 P.2d 617, 3 A.L.R.3d 946] the opinion expressed the following view: ''While there might be a popularly held belief that informers are threatened by guilty defendants, such a belief would not appear to have that degree of reliability or universality to have become a matter of 'common human experience or well known laws of natural science' (*People* v. *Love, supra,* 56 Cal.2d 720, 732 [17 Cal.Rptr. 481, 366 P.2d 33]), so that a jury may take judicial notice thereof, even though such behavior may with some frequency be called to the attention of law enforcement personnel.'' (58 Cal.2d at p. 242.) Here there was testimony to evince the informer's fear. The following is pertinent: ''It is equally obvious—as testimony in the record before us recites—that the person can secure the cooperation of addicts and other persons involved in criminal activity only on the condition that they be as anonymous as possible. The reason is plain: disclosure of the fact that the informer has aided the police results, at best, in ostracism and (for an addict) in drying up of his own sources of supply; at the worst it results in physical harm or even death. It follows that court-made rules which infringe on the desired anonymity result, *pro tanto,* in a decreased effectiveness on the part of police and prosecutor.'' (*People* v. *Gilmore, supra,* 239 Cal.App.2d at p. 131; and see fn. 3, omitted in quotation, pp. 131-132; and Shenk, J. dissenting, *People* v. *Durazo, supra,* 52 Cal.2d 354, 358-359.)

It has been assumed that the informer directed, or was party, to the statements attributed to his brother and to his mother, first, by the defendant who allegedly went to the house on May 16th, and again by defendant's brother who attempted to serve the subpoena the following night. It is possible that those declarants, fearing for the safety of their relative, sought, on their own initiative to avoid a confrontation between the informer, and those whom the record reflects had each been charged as a result of the informer's activities.

Unanswered is whether similar responses would have been made to a deputy sheriff whether armed with a subpoena alone or with a subsequently issued order to enter. (See Process, *infra*.)

The record does not, as a matter of law, require a finding that agents of the state intervened to prevent the defendant's securing the testimony of the informer.

*Entrapment*

Defendant's claim that he was entrapped is countered by his admission and by other evidence which indicates that he knew he was furnishing marijuana not only to Lopez, the alleged persuader, but to "his uncle" (the agent) and possibly others. Entrapment was not established as a matter of law. (See *People* v. *Barone, supra,* 250 Cal.App.2d 776, 781-782; *People* v. *Cordero* (1966) 240 Cal.App.2d 826, 828-829 [49 Cal.Rptr. 924]; *People* v. *Harris, supra,* 213 Cal.App.2d 365, 368-369; *People* v. *Hawkins* (1962) 210 Cal.App.2d 669, 672 [27 Cal.Rptr. 144].)

"The burden of proving the affirmative defense of entrapment is on the accused and he must show that he was induced to commit the crime of which he is charged." (*People* v. *Barone, supra,* 250 Cal.App.2d 776, 782; *People* v. *Harris, supra,* 213 Cal.App.2d 365, 368; *People* v. *Hawkins, supra,* 210 Cal.App.2d 669, 671.) It is unnecessary to determine whether this burden is one of persuasion (see Evid. Code, §§ 500, 501) or of producing evidence (see *id,* § 550). It may be assumed that it is just the latter and that on the whole case the prosecution must establish the defendant's guilt to the degree of proof required by law. It is clear, however, that the prosecution does not have to negate entrapment. Whatever may be said as to the necessity of producing the informer when the alleged entrapment is directly related to the particular transaction charged may not necessarliy be true in connection with allegations that there were many other contacts to which the prosecution was not a party. The defendant is opening up a new field, and it is not unfair to require that his burden of producing evidence of these new transactions include producing the witness to testify to them.

*Right to Process*

Unquestionably the defendant has the right to the process of the court to compel the attendance of witnesses on his behalf. (Cal. Const., art. I, § 13; Pen. Code, § 686, subd. 3; and see *In re Finn* (1960) 54 Cal.2d 807, 813 [8 Cal.Rptr.

741, 356 P.2d 685]; *People* v. *Stone* (1965) 239 Cal.App.2d 14, 21 [48 Cal.Rptr. 469]; *People* v. *Bossert* (1910) 14 Cal. App 111, 114 [111 P. 15].)

■ The law provides methods for securing the attendance of witnesses. (Pen. Code, §§ 2620-2623, §§ 1326-1332 and §§ 1334-1334.6; Code Civ. Proc., §§ 1985-1997.) Where process is equally available to the defendant, he cannot complain that the prosecution failed to secure the attendance of a witness. (See *People* v. *Daboul* (1965) 234 Cal.App.2d 800, 804 [44 Cal.Rptr. 744]; *People* v. *Galvan, supra,* 208 Cal.App.2d 443, 449, 450; *People* v. *Rodriguez, supra,* 202 Cal.App.2d 191, 195 196; and *People* v. *Render, supra,* 181 Cal.App.2d 190, 196.)

■ Generally it is not the duty of the district attorney or public officials to locate or to assist a defendant in locating a witness whose address is unknown to him. (*People* v. *Sullivan* (1962) 206 Cal.App.2d 36, 41 [23 Cal.Rptr. 558]; *People* v. *Ruiz, supra,* 205 Cal.App.2d 674, 679; *People* v. *Bailey* (1949) 91 Cal.App.2d 578, 580 [205 P.2d 418].) ■ Where compulsory process has been issued, served and has proved ineffective, and the court has issued a bench warrant for the witness, neither the court (*People* v. *Brinson* (1961) 191 Cal.App.2d 253, 257-258 [12 Cal.Rptr. 625]); nor the prosecutor (*People* v. *Ruiz, supra,* 205 Cal.App.2d 674, 679) can be chargeable with error because the defendant failed to secure the witness.

In this case compulsory process was issued. Service was not effective because the witness ostensibly concealed himself within his mother's house. Whether by virtue of the provisions of section 1102 of the Penal Code,[13] or because of the inherent power of the court to carry out an analogous procedure to execute the mandate of section 13 of article I of the State Constitution, the provisions of the Code of Civil Procedure regarding the production of witnesses and evidence are deemed applicable. (See *People* v. *Clinesmith* (1959) 175 Cal. App.2d Supp. 911, 913-914 [346 P.2d 923]; and *People* v. *Brinson, supra,* 191 Cal.App.2d 253, 258.) Code of Civil Procedure section 1988 provides: "If a witness is concealed in a building or vessel, so as to prevent the service of a subpoena upon him, any court or judge, or any officer issuing the subpoena, may, upon proof by affidavit of the concealment, and of the materiality of the witness, make an order that the sheriff

---

[13]Penal Code section 1102 provides: "The rules of evidence in civil actions are applicable also to criminal actions, except as otherwise provided in this code."

of the county serve the subpoena; and the sheriff must serve it accordingly, and for that purpose may break into the building or vessel where the witness is concealed.''

 No application was made under this section. The failure to issue such an order, upon proper showing, would have been error. (See *People* v. *Bossert, supra,* 14 Cal.App. 111, 113, 116.) The failure to make a request for such an order, or to make the showing required by the statute, precludes asserting error at this time. (See *People* v. *Marseiler* (1886) 70 Cal. 98, 102; and *cf. In re Finn, supra,* 54 Cal.2d 807, 813; *People* v. *Sullivan, supra,* 206 Cal.App.2d 36, 41; *People* v. *Cuthbertson* (1959) 176 Cal.App.2d 393, 395 [1 Cal.Rptr. 435]; *People* v. *Townsend* (1915) 28 Cal.App. 204, 205 [151 P. 745].)

''The difficulty with appellant's position is that here the court did issue the requested process [a ''body attachment'' which the sheriff returned unserved], and there is no showing that anything that the court did or refused to do is the cause of the absence of the witness at the trial. The *Marseiler* case is in point; it held that the court could require a showing of need for the requested process, which is just what the court did in the present case. Moreover, nowhere in the record is there any showing that Hasse's testimony would have been in any way helpful to appellant or that the lack of her testimony in any way prejudiced him.'' (*People* v. *Brinson, supra,* 191 Cal.App.2d 253, 258-259.)

In *People* v. *Galvan, supra,* the court stated: ''Defendant cannot avoid the consequences of his failure to seek out the informer when he had the opportunity to do so, and likewise he cannot shift to the prosecution the burden of calling the informer as a witness for the defense.'' ''Defendant failed to take advantage of his opportunity to seek out the informer. As we have noted, defendant put off subpoenaing Tucker until two days before the trial, although he had both ample time to locate him and the means of compelling his attendance by following the procedure provided by Penal Code sections 1334 et seq. Furthermore, the tardy attempt to subpoena Tucker was misdirected and inadequate.'' (208 Cal.App.2d at p. 450.)

In *People* v. *Rodriguez, supra,* the court made the following observation: ''Defendant's counsel complains that in this situation the trial court 'should not sit idly by.' This criticism is misdirected. Of all the people in the courtroom, defendant alone knew with certainty whether Penn had

purchased heroin from him as charged by the prosecution. Defendant, better than anyone else, knew whether Penn's presence would be helpful to his defense. If, as counsel now supposes, Penn was in Chino, he was but a two-hour automobile ride from the courthouse, and the court had discretion to order his presence if a request had been made under Penal Code, section 2621. No request was made by counsel. This court must conclude not that defendant's trial tactics were inept, but that his brief is disingenuous." (202 Cal.App.2d at pp. 195-196.) In this case defendant alone knew with certainty whether Lopez had importuned him for the period and in the manner he claimed. Lopez may still have been at his mother's home on the morning of May 18th. If an application had been made for an order under section 1988 of the Code of Civil Procedure, the question could have been resolved, or at least brought to a head. If the court proceeded to compel the witness' presence on its own initiative and the witness proved unfavorable to the defendant (see *People* v. *Kiihoa* (1962) 209 Cal.App.2d 196 [25 Cal.Rptr. 813]; fn. 9), the court might have been subject to criticism. Without resorting to the alternatives quoted in *Rodriguez*, it suffices to note that the defendant at the trial, and on appeal, has been more intent upon establishing some dereliction on the part of the prosecution than in securing the presence and testimony of the informant on his own behalf.

In *Alvarez* v. *United States* (9th Cir. 1960) 282 F.2d 435, the court offered to issue a subpoena after the defendant stated, and offered to testify, that the witness could not be found at the address given by the prosecution. "Counsel declined the issuance of the 'forthwith subpoena' for fear that a 'not found' return by the marshal would indicate that the witness was not available to the government and thereby destroy the effect of appellant's contention that the witness was available to the government but unavailable to the appellant." The court concluded: "The appellant should have accepted the offer of the court to have issued a 'forthwith subpoena', which may have resulted in the production of the witness Johnson. Apparently appellant desired neither the presence of Johnson nor a 'not found' return by the United States Marshal. Under the record in this case we find no prejudicial error on the part of the trial court in rejecting the offer of proof made by appellant's counsel." (282 F.2d at p. 439.)

From the whole record it appears that defendant's failure to secure the testimony of his former friend and

betrayer was caused by his own lack of diligence in pursuing the processes available to him to secure witnesses, rather than by any breach of duty on the part of the prosecution. To hold otherwise, in the circumstances of this case, would open the door to connivance where the informer, either fearful or remorseful in the presence of the defendant or his relatives, conceals himself from the service of the subpoena, to the end that defendant may secure a dismissal of the charges.

The judgment is affirmed.

Molinari, P. J., and Elkington, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 5, 1967. Peters, J., was of the opinion that the petition should be granted.