[Crim. No. 12099. In Bank. June 21, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT EMMETT THORNTON, Defendant and Appellant.

742

## Counsel

Morris Lavine and James E. Patterson for Defendant and Appellant.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, Phillip C. Griffin and Norman H. Sokolow, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**SULLIVAN, J.**—Defendant Robert Emmett Thornton was charged by information with two counts of kidnaping for the purpose of robbery (Pen. Code, § 209),[1] one count of simple kidnaping (§ 207), two counts of robbery (§ 211), four counts of rape (§ 261), two counts of sex perversion (§ 288a), and one count of sodomy (§ 286). His motion under section 995 was granted as to the four rape counts, and the counts were renumbered pursuant to stipulation of counsel. After a trial by jury he was found guilty as charged of the eight counts remaining. As to each of the two counts of kidnaping for the purpose of robbery it was found that the victim suffered bodily harm; as to the two robbery counts one was found to be of the first degree and one of the second degree; as to each of the two sex perversion counts it was found that the victim's participation was compelled by force, violence, duress, menace, or threat of great bodily harm. The jury also found that defendant was armed with a deadly weapon at the time of the commission of all of the charged crimes excepting one of the section 209 counts and one of the section 211 counts.

At the conclusion of further proceedings on the issue of penalty the jury determined that defendant should suffer death as to one of the section 209 counts and life imprisonment without possibility of parole as to the other.

Defendant then moved that the court hold an evidentiary hearing on the question whether the death penalty provided for in section 209 is offensive to the cruel and unusual punishment provisions of the state and federal Constitutions. The motion was granted and there ensued a lengthy hearing in the course of which both the defense and the prosecution called numerous witnesses. At the conclusion of the hearing the court made find-

---

[1]Hereafter, unless otherwise indicated, all section references refer to the Penal Code.

ings of fact and conclusions of law to the effect that the provision in question did not offend the indicated constitutional prohibitions.

Defendant was sentenced to death and life imprisonment without possibility of parole respectively on the two counts of kidnaping for the purpose of robbery with bodily harm. He was sentenced to state prison for the term prescribed by law as to the other six counts.[2] His appeal is automatic. (§ 1239, subd. (b).)

In *People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880], we held that the death penalty violated our state constitutional prohibition against cruel or unusual punishment. (Cal. Const., art. I, § 6.)[3] And in *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726], the United States Supreme Court ruled that imposition of the death penalty in these circumstances contravened the federal Constitution. As defendant's death penalty must therefore be set aside, it is unnecessary to consider the claims of error arising out of his penalty trial.[4] We proceed to a determination of defendant's contentions relative to the judgment of guilt.

The evidence in this case, viewed in the light most favorable to the People, showed that defendant, during the six-month period extending

---

[2]The court stayed execution of sentence as to the robbery count found to be of the first degree until execution of the death sentence, and permanently thereafter. Execution of sentence as to the sodomy count was stayed pending execution of the death sentence or the completion of the sentence as to the first degree robbery count, and permanently thereafter. Execution of sentence as to one of the sex perversion counts was stayed pending execution of the death sentence, or completion of the sentence as to the first degree robbery count, or completion of the sentence as to the sodomy count, and permanently thereafter. Execution of sentence as to the robbery count found to be of the second degree was stayed pending completion of the sentence of life imprisonment without possibility of parole imposed as to the second count of kidnaping for the purpose of robbery with bodily harm, and permanently thereafter. Execution of sentence as to the simple kidnaping count was stayed pending completion of the sentence as to the second sex perversion count, and permanently thereafter. Finally, it was provided that if the death sentence should for any reason not be executed, sentences as to the two counts of kidnaping for the purpose of robbery with bodily harm and one count of sex perversion were to run concurrently.

[3]For the effect of article I, section 27, of the California Constitution on this issue, see *People* v. *Murphy* (1972) 8 Cal.3d 349, 352, footnote 2 [105 Cal.Rptr. 138, 503 P.2d 594].

[4]One of defendant's contentions relating to the penalty trial was that it is cruel and unusual punishment to impose the death penalty for a crime in which no death has occurred. (See generally *Ralph* v. *Warden, Maryland Penitentiary* (4th Cir. 1970) 438 F.2d 786; cf. *Weems* v. *United States* (1910) 217 U.S. 349 [54 L.Ed. 793, 30 S.Ct. 544].) This issue was before the United States Supreme Court in two of the three cases involved in the *Furman* decision but was not reached because of the court's conclusion on the broader issue.

from February to July of 1966, engaged in a course of criminal conduct wherein he succeeded in gratifying perverse sexual desires, by means of brutal force causing bodily injury, upon the unwilling persons of five different women whom he kidnaped at different times and places for that purpose and the additional purpose of robbery. The eight counts of which defendant was found guilty arose from his conduct as to three of the women; evidence as to the remaining two women was admitted for the purpose of showing his identity through a common plan.

Although it is not necessary to our decision in this case that we set forth in minute detail the unsavory particulars of each of the five assaults as to which the prosecutor produced evidence, our resume will include certain details which will be relevant to contentions which we later consider. Although, as indicated above, the evidence concerning two of the five women was admitted only for the purpose of identifying defendant as the perpetrator of the charged acts relating to the remaining three women, our summary will consider the evidence as to all five women at this point in the interest of preserving chronological order.

(1) At 8 p.m. on February 14, 1966, Eileen S., an unmarried girl 18 years of age, left her place of employment in Huntington Park and drove to a drugstore in Downey to make a purchase. When she returned from the drugstore and was entering her car defendant appeared suddenly and forced his way inside the car on the driver's side. He put his arm around her throat and ordered her not to look at him. When Miss S. asked him what he wanted he replied: "I just want your money; I am not going to hurt you." Keeping his right arm around the young woman's throat, defendant started the car and drove out of the parking lot. They proceeded in this manner—defendant driving the car with his left hand while holding his victim by the throat with his right arm—for a distance of some four blocks, where defendant parked the car. Again ordering Miss S. not to look at him, defendant then demanded that she give him money from her purse. When she had done so he seized her and, telling her that he would kill her if she screamed, began to undress her. Miss S. was crying and pleading at this time, but she was too frightened to scream. When she was completely undressed defendant performed an act of sexual intercourse upon her. Then, forcing Miss S. to assume a position with her head between her legs and stating that he would return and kill her if she moved from that position, he got out of the car and fled. When defendant had gone Miss S. put on her coat and ran to a nearby house where she called the police. In her description of defendant she noted that he smelled of gasoline and grease.

(2) On June 3, 1966, Marcia B., an unmarried girl 19 years of age, departed from the Los Angeles County home of her fiance, where she had been visiting him and his parents, and began driving north to her home in Montana. However, she became lost when she made a wrong turn off the freeway onto the Angeles Forest Highway. As she was proceeding down this highway she noticed at one point a light colored Ford automobile parked by the side of the road; a few moments later this car, driven by a single male occupant, passed her, and she did not see it again. Shortly thereafter she came upon defendant standing in the middle of the road and waving his arms. Thinking that he needed help she slowed down to stop, and before her car had been brought to a complete stop defendant opened the door and placed his foot on the brake. Miss B. began to struggle with defendant in order to get him out of the car and pressed on the accelerator, but defendant overpowered her and brought the car to a stop. Defendant then tied Miss B.'s hands with a rope, pushed her into the back seat, and told her to lie down. He also told her not to look at him, and when she began to scream he told her that he would kill her if she continued. The defendant gagged and blindfolded Miss B. and tied her feet and, after he had gone through her purse and wallet, drove some distance to a remote area. There he untied her feet and led her through bushes to a small clearing, where he tied her down to stationary objects, completely undressed her, and proceeded to perform upon her a series of cruel and brutal acts of a sexual nature, most of which were calculated to cause pain and some of which caused severe injury.[5] Several times defendant expressed his desire and intention to hurt Miss B. At length defendant released her from the stationary objects to which she had been tied and led her, still gagged and blindfolded, back to her car, where he again tied her hands and drove away with her lying in the back seat. After about 10 minutes he stopped the car, untied Miss B., and removed her gag and blindfold. He then ordered her to wait 15 minutes before departing and, stating "Remember I can still kill you," left on foot. After waiting 10 minutes Miss B. drove to Pasadena and reported the incident to the police. She noted that her assailant "smelled like he had been around machinery, like a truckdriver would."

(3) One evening in April of 1966, Mrs. Edith B., aged 53, became acquainted with defendant at a tavern in Downey, and they, along with a married couple who were friends of Mrs. B., spent the evening dancing

---

[5]Although we do not intend to recount all of the depraved acts which defendant performed at this time it is necessary to our consideration of defendant's contentions to note (1) that defendant manifested extreme brutality, including at one point kicking Miss B. in the breast and face, and (2) in his efforts to cause pain in his victim, defendant at one point placed a length of cloth up into her vagina and slowly drew it out.

at another tavern. Mrs. B. did not see defendant again until June 18, 1966, when she and the same married couple again encountered him in the tavern where they had met. They became reacquainted, and defendant suggested that the four of them go to a certain restaurant for some steaks. They left the tavern and Mrs. B. agreed to ride to the restaurant with defendant in his car, her friends riding in their own car. As soon as Mrs. B.'s friends had driven away toward the restaurant, however, defendant made a statement indicating that he had other intentions, and when Mrs. B. attempted to leave the car he grabbed her by the hair and told her to lie down. Then defendant drove for five or ten minutes to a place among some apartments, parked, ordered Mrs. B. to disrobe, and announced that he was going to have sexual intercourse with her. When she protested he put his hand over her mouth and forcibly undressed her. He threw her purse, which had $60 or $70 in it, into the back seat and, partially disrobing himself, attempted to perform an act of sexual intercourse. Mrs. B. continued to struggle and to attempt escape, however, and when defendant was unable to subdue her by bodily force—including holding her by the throat and striking her on the head—he drew a knife and told her that he would slit her throat if she attempted to resist or escape, representing to her that she would not be "the first one." Then defendant sought to make Mrs. B. perform an act of oral copulation upon him, but she told him that if he would let her have a cigarette first she would accede to his wishes and then take him to her apartment. Defendant agreed, but while he was hunting for cigarettes Mrs. B. jumped from the car and escaped. She ran screaming toward an apartment building, which was in fact the building in which defendant lived. A tenant came out of the building to assist Mrs. B. and defendant thereupon departed rapidly in his car.

(4) About 12:30 a.m. on July 26, 1966, Mrs. Suzanne P., a married woman 19 years of age, went to a laundromat in La Puente where she had earlier in the evening placed a load of clothes in a machine. As she was folding the clothes after drying them she noticed that defendant had entered the laundromat and was walking around inside; there were no other persons there. She was preparing to depart when defendant suddenly attacked her, knocked her to the floor, and, holding a knife in one hand while he held her on the floor, said that he would kill her unless she stopped screaming. Then he dragged her to the rear of the laundromat, saying that he just wanted to have sexual intercourse with her. She persuaded him to throw away the knife and apparently lay still while he partially disrobed her and attempted an act of sexual intercourse which failed because of defendant's failure to achieve an erection. Then defendant performed an act of oral copulation upon Mrs. P., followed by another un-

successful attempt at sexual intercourse. At length defendant got up from the floor, pulled up his pants, and asked Mrs. P. for her purse. She replied that she did not bring a purse. Defendant then retrieved his knife and, telling Mrs. P. to remain where she was, backed slowly out the rear door. Mrs. P. got up immediately, ran to her car, and drove home where she reported the incident to her husband and called the police.

(5) At 10:30 p.m. on July 30, 1966, Mrs. Ottilia J., aged 45, met her fiance and her married daughter at a tavern in San Gabriel. After she had had a cocktail and part of a second one, she went out to the front door of the tavern to have a breath of fresh air and to get away from the crowd. As she was about to return inside, defendant approached her from the rear, held a pistol at her back, and ordered her to walk down the street with him. She complied out of fear, and defendant took her a distance of approximately one block to a group of parked cars behind a service station. When Mrs. J. asked where he was taking her, he replied that he had a car "all ready" for her which he had previously broken into. He approached one of the cars, opened the passenger door, and, twisting her arm until she heard it pop, pushed her into the front seat. There he ordered her to begin disrobing, threatening her with death if she failed to do so, and after she had taken her blouse off, he removed her slacks and tore off her underclothes. Making a noose out of her underpants, he placed the same around her neck, tightened it, and told her to remain silent or he would kill her—representing to her that he had killed two other women and "one more life won't make a difference to me." Then defendant began to go through Mrs. J.'s purse; while he was doing so Mrs. J. on three occasions sought to rise up from the supine position on the seat which he had ordered her to assume, and on each occasion defendant struck her in the chest with his fists and told her to stay down. When he had finished going through the purse, and had taken therefrom a wallet containing money and two packages of cigarettes, defendant began to bite Mrs. J. on her breasts and in her genital area with the stated intention of causing her pain. Then he performed four acts of forcible sexual intercourse upon her, forced her to perform an act of oral copulation upon him, and committed various acts of sexual abuse calculated to cause pain—inquiring the while of his victim whether he was being successful in that aim.[6] After a time defendant ordered Mrs. J. to dress and told her that he was going to kill her. After she had partially dressed the two left the automobile and began walking down the street again, defendant holding his gun

---

[6]Again it is necessary to observe the precise nature of one of these acts: At one point defendant placed a piece of paper and Mrs. J.'s nylon panties up into her vagina and then drew out these objects.

against her ribs. At one point defendant forced Mrs. J. to walk over broken glass in the gutter with her bare feet, stating again that he wished to hurt her. Finally they came to a fenced field, and he lifted her over the fence and dropped her in the field. He then forced her to walk into the field, across two more streets, and into other fields. In the course of this journey he committed six acts of forcible intercourse, one act of sodomy, and various acts of cruelty and depravity calculated to cause her discomfort and pain. Several times he repeated his statement that he was going to kill her, but Mrs. J., who had been "talking for her life" throughout the ordeal, finally convinced him that killing her would do him no good and he released her. Mrs. J. walked a mile to her daughter's house, arriving there at 4:30 a.m., and there collapsed. She refused to report the crime at that time, in spite of her daughter's urging, because of threats which defendant had made. However, at 1 p.m. the following afternoon she reported the crime to the sheriff.

Defendant was arrested as a suspect in the case involving Edith B. on June 23, 1966—or five days after the event involving that lady had occurred. Apparently he remained in custody on this charge until July 17 when he was released on bail pending trial. As indicated above, the events involving Suzanne P. and Ottilia J. occurred on July 25 and July 30, respectively.

On August 16, 1966, defendant was again arrested after Ottilia J. had several days before identified a photograph of him. That evening he was positively identified at a sheriff's lineup by Eileen S. as the man who had assaulted her on February 14, 1966. The following day another lineup was held at the Southgate Police Department, and both Suzanne P. and Ottilia J. made positive identifications. On March 4, 1967, after the trial of the cause had commenced, Marcia B. made a positive identification of defendant at a lineup.

Of the eight counts charged against defendant in the amended information, four related to the events involving Ottilia J. (I-IV: kidnaping for the purpose of robbery, robbery, sex perversion, sodomy), two related to the events involving Eileen S. (V-VI: kidnaping for the purpose of robbery, robbery), and two related to the events involving Suzanne P. (VII-VIII: simple kidnaping, sex perversion).

The theory of the defense at the guilt phase of the proceedings was that of mistaken identification. Defendant took the stand in his own behalf and testified to the effect that he had worn a beard on February 14, 1966, the

date of the alleged assault on Eileen S.,[7] and that he had baby-sat for his sister on that evening; that he was at the home of his brother-in-law, where he was staying, on July 25, 1966, the date of the alleged assault on Suzanne P.; that he had never been in the area where the assault on Ottilia J. had allegedly taken place; and that he did not commit any of the charged crimes. Defendant's testimony was substantially weakened on cross-examination.

Robert L. Thornton (not related to defendant Robert Emmett Thornton) testified for the defense in response to certain prosecution testimony which tended to connect defendant with the Ottilia J. offenses by identifying him as an habitué of the garage in whose parking lot the initial assaults took place. Thornton testified that he was himself one of the group of young men who worked on their automobiles in the lot of the garage; that defendant was not one of that group; and that one Ron Franks was one of that group and in general fit the description which the prosecution witness had given.

Diane Southwell, defendant's sister, testified that defendant had stayed with her when he returned from military duty in Vietnam late in January of 1966; that he had a beard from that time until he moved to the home of her former husband in the middle or late part of February; and that he had baby-sat for her on a week night in the middle part of February. This testimony tended to support defendant's contention that he had worn a beard at the time of the Eileen S. incident and had baby-sat on the night in question.

Willis Green, Mrs. Southwell's former husband, also testified that defendant had worn a beard on the date of the Eileen S. incident. He further testified that on July 17, 1966, he had posted bond for defendant in the Edith B. matter; that after that date and until the date of the Ottilia J. incident (July 30, 1966) defendant had spent every evening at Green's apartment; and that on the date of the Ottilia J. incident, he, Green, specifically recalled spending the evening at the apartment with his son and defendant until the hour of 1 a.m.[8] Mr. Green finally testified that a pistol and a hunting knife found in his apartment were his property and were at no time loaned by him to defendant.

The final witness for the defense gave testimony which bore upon testimony given by Ottilia J. to the effect that her attacker had had a large

---

[7]According to the testimony of Eileen S. and the description given by her after the crime, her assailant had not worn a beard.

[8]The son, Larry Green, also testified in some detail concerning defendant's whereabouts on July 30. He stated that he was with defendant all evening at his father's apartment and that the two of them went to bed at 1:30 a.m.

sexual organ. The witness, a urologist, testified that he had examined defendant and that his sexual organ, in both flaccid and erect states, was of low average size.

On rebuttal the prosecution, through various police officers, related previous statements of defendant and other defense witnesses which cast doubt upon their courtroom testimony.

■ Defendant contends that he was denied due process in the guilt phase because certain prospective jurors who expressed an inability to impose the death penalty, and were excused for cause, nevertheless either (1) stated that their views *would not* prevent them from rendering a fair and impartial decision on the issue of guilt, or (2) stated that their views *might* prevent them from rendering a fair and impartial decision on the issue of guilt, or (3) were not asked whether their views would have such an effect. These prospective jurors, it is urged, should have been allowed to sit on the jury for the trial of issues of guilt. This argument, however, was answered by us in *People* v. *Washington* (1969) 71 Cal.2d 1061, at pages 1087-1090 [80 Cal.Rptr. 567, 458 P.2d 479]. The seating of persons who, although unable to impose the death penalty, might have been able to render a fair and impartial decision on the issue of /guilt, would have resulted in separate juries for guilt and penalty issues whenever the trial of the latter issue was required under sections 190 and 190.1 of the Penal Code.[9] However, the Legislature in section 190.1 expressed a clear preference that both guilt and penalty issues be tried by the same jury,[10] and we have repeatedly pointed out that insistence upon a single jury pursuant to this preference did not deprive defendant of his right to an impartial jury. (See *People* v. *Washington, supra,* 71 Cal.2d 1061, 1089; *People* v. *Tolbert* (1969) 70 Cal.2d 790, 811 [76 Cal.Rptr. 445, 452 P.2d 661]; *People* v. *Gonzales* (1967) 66 Cal.2d 482, 499 [58 Cal.Rptr. 361, 426 P.2d 929]; *People* v. *Thomas* (1967) 65 Cal.2d 698, 706 [56 Cal.Rptr. 305, 423 P.2d 233]; *People* v. *Smith* (1966) 63 Cal.2d 779, 789 [48 Cal.Rptr. 382, 409 P.2d 222]; *People* v. *Gilbert* (1965) 63 Cal.2d

[9]Sections 190 and 190.1, of course, have been declared unconstitutional by us insofar as they purport to authorize imposition of the death penalty. (*People* v. *Anderson, supra,* 6 Cal.3d 628, 656-657.) Although the addition of article I, section 27, to the California Constitution may have the effect of permitting imposition of the death penalty in the future—a question upon which we offer no present views—the use of absolute jury discretion in determination of such penalty is foreclosed by *Furman* v. *Georgia, supra,* 408 U.S. 238.

[10]Section 190.1 provides in relevant part: "If the defendant was convicted by a jury, the trier of fact [on the issue of penalty] shall be the same jury unless, for good cause shown, the court discharges that jury in which case a new jury shall be drawn to determine the issue of penalty. . . ."

690, 711-712 [47 Cal.Rptr. 909, 408 P.2d 365], vacated on other grounds, *Gilbert* v. *California* (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951].)

Defendant contends that the evidence was insufficient to support the verdicts. ■ First, he points out that none of the victims testified that the assailant stuttered; and he urges, in light of evidence that defendant had such a speech defect, that their identifications of defendant were mistaken as a matter of law. Second, he urges that the testimony of Ottilia J. was inherently improbable in that it represented that defendant performed ten acts of sexual intercourse and various other acts requiring an erection on his part within a period of from three to four hours.

As to the first contention, it is apparent that defendant's stuttering was relevant to the matter of identification only insofar as it could be inferred that the defect would have manifested itself during the course of the alleged assaults. There was no evidence before the jury to the effect that defendant stuttered consistently and without regard to circumstances, and there was evidence to the effect that defendant was capable of speaking for extended periods of time without noticeable stuttering. Clearly it was within the proper province of the jury to draw or refuse to draw the indicated inference.

■ As to the second contention—that the testimony of Ottilia J. was inherently improbable—we apply the rules stated by this court in *People* v. *Huston* (1943) 21 Cal.2d 690 [134 P.2d 758]. "Although an appellate ·court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category. [Citation.] To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]" (21 Cal.2d at p. 693; cf. *People* v. *Headlee* (1941) 18 Cal.2d 266, 267-268 [115 P.2d 427]; *People* v. *Carvalho* (1952) 112 Cal.App. 2d 482, 489 [246 P.2d 950].)

Defendant's argument seems to be that it would have been "physically impossible" for him to perform ten acts of sexual intercourse and various other acts requiring erection within the space of three to four hours. However, no medical evidence was presented tending to demonstrate that such

a performance was beyond the limits of masculine vitality and endurance, and we are not prepared to reach such a conclusion as a matter of judicial notice. Moreover, even if we were to assume the truth of the medical proposition which defendant advances, it would not follow that the whole of Ottilia J.'s testimony should be rejected as a matter of law—for in the circumstances of this case the accuracy of the victim's computations is peripheral to the thrust of her testimony, i.e., that defendant on the night in question raped her several times and performed various other grotesque indecencies upon her person. Even if the jury had considered that Ottilia J.'s testimony as to the number of acts involved was the result of deliberate falsehood rather than misapprehension or exaggeration, it was clearly free—after giving this consideration its appropriate impeaching effect—to conclude that the more vital portions of her testimony were true.

Defendant raises four contentions concerning the evidence of similar crimes against women other than the three prosecutrices. He urges (1) that the evidence of the Marcia B. and Edith B. incidents failed to meet the requisites for admission of other-crimes evidence and was therefore erroneously admitted; (2) that the admission of such evidence without prior notice to defendant denied him due process of law; (3) that it was error to permit cross-examination of defendant relative to these incidents; and (4) that such cross-examination, which continued in spite of defendant's persistent refusal to answer on the grounds of the privilege against self-incrimination, was in violation of defendant's Fifth Amendment rights.

We first consider whether evidence of the incidents involving Marcia B. and Edith B. were properly admitted under the rules governing the admission of other-crimes evidence.

It should be noted at the outset that the only issue upon which the subject evidence was relevant was that of the *identity*[11] of the perpetrator of the charged offenses. The defense raised no issue as to the intent, knowledge, or motive of the perpetrator but sought only to show that defendant was not he. In this regard the instant case is similar to the cases of *People* v. *Haston* (1968) 69 Cal.2d 233 [70 Cal.Rptr. 419, 444 P.2d 91]; *People* v. *Cavanaugh* (1968) 69 Cal.2d 262 [70 Cal.Rptr. 438, 444 P.2d 110], *People* v. *Floyd* (1970) 1 Cal.3d 694 [83 Cal.Rptr. 608, 464 P.2d 64], and *People* v. *Banks* (1970) 2 Cal.3d 127 [84 Cal.Rptr. 367, 465 P.2d 263]—and is to be contrasted with cases such as *People* v. *Cramer* (1967) 67 Cal.2d 126 [60 Cal.Rptr. 230, 429 P.2d 582], *People* v. *Durham*

---

[11]The remarks of the trial court at the time of its ruling show that the subject evidence was admitted solely because of its relevance to the issue of identity. The jury was properly instructed that the evidence was admitted for a limited purpose.

(1969) 70 Cal.2d 171 [74 Cal.Rptr. 262, 449 P.2d 198], *People* v. *Sam* (1969) 71 Cal.2d 194 [77 Cal.Rptr. 804, 454 P.2d 700], and *People* v. *Schader* (1969) 71 Cal.2d 761 [80 Cal.Rptr. 1, 457 P.2d 841].

In *People* v. *Haston, supra,* we set forth and explained the rationale and proper application of the rules of other-crimes evidence in cases wherein such evidence is offered to show the identity of the perpetrator of the charged offenses. After reviewing the basic rules of other-crimes evidence, which we need not repeat here, we stated that the probative value of such evidence on the issue of identity is dependent upon the extent to which it raises an inference that the perpetrator of the uncharged offense was the perpetrator of the charged offense, and that the determination as to the presence and strength of such an inference proceeds through an evaluation of marks shared by the uncharged and charged crimes. We went on to explain the factors pertinent to such an evaluation: "It is apparent that the indicated inference does not arise . . . from the mere fact that the charged and uncharged offenses share certain marks of similarity, for it may be that the marks in question are of such common occurrence that they are shared not only by the charged crime and defendant's prior offenses, but also by numerous other crimes committed by persons other than defendant. On the other hand, the inference need not depend upon one or more unique or nearly unique features common to the charged and uncharged offenses, for features of substantial but lesser distinctiveness, although insufficient to raise the inference if considered separately, may yield a distinctive combination if considered together. Thus it may be said that the inference of identity arises when the marks common to the charged and uncharged offenses, considered singly or in combination, logically operate to set the charged and uncharged offenses apart from other crimes of the same general variety and, in so doing, tend to suggest that the perpetrator of the uncharged offenses was the perpetrator of the charged offenses." (Fns. omitted.) (69 Cal.2d at pp. 245-246.) Finally, we pointed out that because the probative value of other-crimes evidence on the issue of identity depends wholly upon the strength of the inference, and because the prejudicial effect of such evidence is always manifest, the court's discretion should be exercised in favor of exclusion if the inference of identity is weak. (69 Cal.2d at pp. 246-247.)

■ To recapitulate, only common marks having some degree of distinctiveness tend to raise an inference of identity and thereby invest other-crimes evidence with probative value. The strength of the inference in any case depends upon two factors: (1) the *degree of distinctiveness* of individual shared marks, and (2) the *number* of minimally distinctive shared marks.

Turning to the facts before us, we do not consider that the two incidents in question—Marcia B. and Edith B.—are sufficiently similar *to one another* to allow us to consider them together as two essentially identical instances of the same conduct.[12] Thus, we treat them separately.

Clearly the Marcia B. incident has several characteristics which distinguish it from the ordinary case of sexual assault. Among these are: (1) The method of establishing contact with the victim, i.e., the use of a ruse or the element of surprise to gain entry to the victim's car. (2) The transportation of the victim to a place remote from the point of initial contact. (3) The fact of total rather than merely partial disrobing of the victim. (4) The fact that the victim's purse was gone through *prior* to any act of sexual assault. (5) The express threat to kill the victim if she attempted to cry out. (6) The smell of gasoline upon the attacker. (7) The use of extreme brutality such as kicking and striking the victim with a closed fist. (8) An expressed desire on the part of the attacker to cause pain in his victim. (9) The insertion of foreign matter into the vagina of the victim.

These marks range in distinctiveness from number (9), the most distinctive, to perhaps number (1) or number (5), the least distinctive. As we have said, however, each of these marks is of substantially less than commonplace occurrence.

Turning to the charged offenses for purposes of comparison, we find that in the Eileen S. case also the attacker entered the victim's car by means of surprise (#1); the victim was driven to a remote place before the sexual attack took place (#2); the victim was totally rather than partially disrobed (#3); money was taken from the victim prior to sexual assault (#4); the victim was told that she would be killed if she attempted to cry out (#5); and the attacker smelled of gasoline or machinery (#6). Thus, the Eileen S. incident is seen to have six distinctive marks in common with the Marcia B. incident.

Of the nine marks found to be distinctive in the Marcia B. incident, only one (i.e., threat to kill if the victim cried out) appears in the Suzanne P. case. This mark is not, we think, of a high order of distinctiveness.

The Ottilia J. case, on the other hand, shares with the Marcia B. incident a mark of extreme rarity, to wit, the fact that the attacker, in an

---

[12]In *Haston* the two uncharged offenses were so similar to one another that separate consideration was unnecessary.

effort to cause pain in the victim, inserted foreign material into her vagina.[13] Moreover, several other distinctive marks are shared by the two cases. Again, the victim was taken from the point of initial contact with the attacker to a remote area (#2); the victim was required to totally disrobe (#3); the attacker went through the victim's purse before undertaking any sexual assault (#4); the victim was threatened with death if she cried out (#5); brutal treatment in the form of blows was inflicted on the victim (#7); and the attacker expressed a desire to cause pain (#8).

■ We conclude from the foregoing that the number and distinctiveness of the marks shared by the Marcia B. and Eileen S. incidents, and by the Marcia B. and Ottilia J. incidents, are sufficient to raise a strong inference that the perpetrator of the Marcia B. offenses was the perpetrator of the Eileen S. and Ottilia J. offenses; that evidence of the Marcia B. incident has significant probative value on the issue of the identity of the perpetrator of those charged offenses; that such probative value is not significantly diminished by the presence of certain marks of *dissimilarity* between the uncharged and charged offenses;[14] that such probative value is sufficient to outweigh the prejudicial effect inherent in the evidence; and that evidence of the Marcia B. incident was therefore admissible as to the Eileen S. and Ottilia J. crimes. ■ We further conclude that the paucity of distinctive marks common to the Marcia B. and Suzanne P. incidents renders the probative value of the Marcia B. evidence weak as to the Suzanne P. crimes, and that such evidence was not properly admissible as to such crimes. However, because defendant sought no admonition or instruction limiting the application of the Marcia B. evidence to the Eileen S. and Ottilia J. crimes he may not now complain of the fact that such evidence was admitted without limitation in this respect. (See *People* v. *Findley* (1901) 132 Cal. 301, 306 [64 P. 472].)

We next determine whether and to what extent evidence of the Edith B. incident was properly admissible. Although as we have indicated above the Edith B. and Marcia B. incidents are not so similar as to be identical for present purposes, they do in fact share a number of distinguishing marks, among which are: (A) The transportation of the victim by car from the place of abduction to a remote place prior to sexual assault

---

[13]During argument before the trial court on the admissibility of the other-crimes evidence the prosecutor stated that an examination of Bureau of Criminal Identification and Investigation modus operandi files in Sacramento revealed that the Marcia B. and Ottilia J. cases were the only ones on record wherein the attacker had performed the act here in question.

[14]See *People* v. *Haston, supra,* 69 Cal.2d 233, 249, footnote 18.

(#2 Marcia B.). .(B) Total rather than partial disrobing (#3 Marcia B.). (C) A threat to kill the victim if she resisted (#5 Marcia B.). (D) The use of physical brutality such as striking the victim (#7 Marcia B.). In addition, the Edith B. incident manifests other distinguishing characteristics. (E) The attacker's representation to the victim that he had killed other victims and that one more life would not be of consequence to him. (F) The attacker's use of a knife to threaten a resisting victim. (G) The attacker's resort to choking the victim in order to secure compliance with his wishes. (H) The attempt to commit an act of sexual perversion.

Again, these marks vary in distinctiveness, but all are of substantially less than common occurrence.

Turning again to the charged offenses, we find that in the Eileen S. case the victim was also driven to a remote place before the sexual assault took place (A); the victim was totally disrobed (B); the attacker told the victim that he would kill her if she cried out or resisted (C); and the attacker held the victim by the throat in order to subdue her (G).

In the Suzanne P. case the attacker told the victim that he would kill her if she cried out or resisted (C); threatened the victim with a knife (F); and accomplished an act of sexual perversion upon her (H).

In the Ottilia J. case the victim was totally disrobed (B) and was informed that she would be killed if she resisted (C) and that she would not "be the first" one to be killed by the attacker (E). Moreover, the attacker repeatedly struck the victim (D), choked her with her panties in order to stifle resistance (G), and forced her to perform an act of sexual perversion (H).

■ From the foregoing we conclude that the number and distinctiveness of the marks shared by the Edith B. and Eileen S. incidents, by the Edith B. and Suzanne P. incidents, and by the Edith B. and Ottilia J. incidents are sufficient to raise a strong inference that the perpetrator of the Edith B. offenses was the perpetrator of each of the three charged offenses; that evidence of the Edith B. incident has significant probative value on the issue of the identity of the perpetrator of the three charged offenses, which probative value is not significantly diminished by the presence of certain dissimilarities between the charged and uncharged offenses (see fn. 14, *ante*); that such probative value is sufficient to outweigh the prejudicial effect inherent in such evidence; and that evidence of the Edith B. incident was therefore admissible as to all charged offenses.

We therefore hold that the trial court was within the limits of sound

judicial discretion when it admitted evidence of the Marcia B. and Edith B. incidents on the issue of identity.

Secondly, defendant contends that even if the subject evidence met the requisites for admission of other-crimes evidence it should not have been admitted against him because he had no notice prior to trial that he would be required to meet such evidence. ■ To the extent that this contention contemplates that other offenses should be set forth in the formal accusation it is squarely contrary to well-settled and soundly reasoned legal principles. To the extent that it asserts that defendant in fact had no notice prior to trial that other offenses would be used to identify him as the perpetrator of the charged offenses it is contradicted by the record. No denial of due process here occurred.

■ Thirdly, defendant contends that it was error to permit the prosecution to cross-examine him on the Marcia B. and Edith B. incidents because he did not testify relative to these incidents on direct examination. This contention is without merit. Defendant's testimony on direct examination was essentially a general denial of guilt as to each and all of the charged crimes and sought to establish that the victim's identification of him as the malefactor was mistaken. He thus placed the matter of identity squarely in issue, and the prosecutor's attempt to establish on cross-examination his involvement in offenses whose similarity to the charged offenses indicated a common malefactor was proper. (*People* v. *Ing* (1967) 65 Cal.2d 603, 611 [55 Cal.Rptr. 902, 422 P.2d 590]; *People* v. *Schader, supra,* 71 Cal.2d 761, 770-771.)

■ Moreover, defendant's privilege against self-incrimination was not infringed by the allowance of such cross-examination against defendant's express claim of privilege,[15] by the prosecutor's comment upon defendant's refusal to answer, or by the court's instruction permitting the jury to draw adverse inferences from such refusal (former CALJIC No. 51). A defendant who takes the stand to testify in his own behalf waives the privilege against self-incrimination to the extent of the scope of relevant cross-examination. (*People* v. *Schader, supra,* 71 Cal.2d 761, 770-771; *People* v. *Ing, supra,* 65 Cal.2d 603, 610-611; see *People* v. *Perez.* (1967) 65 Cal.2d 615, 621 [55 Cal.Rptr. 909, 422 P.2d 597].) "It matters not that the defendant's answer on cross-examination might tend to establish his guilt of a collateral offense for which he could still be prosecuted. (*Johnson* v. *United States, supra,* 318 U.S. 189, 192 et

---

[15]On cross-examination defendant consistently refused, on Fifth Amendment grounds, to testify relative to the Edith B. and Marcia B. incidents.

seq. [87 L.Ed. 704, 709, 63 S.Ct. 549]; *Carpenter* v. *United States,* 264 F.2d 565, 569; see McCormick on Evidence (1954), p. 275.)" (*People* v. *Ing, supra,* 65 Cal.2d 603, 610.)

Defendant next contends that he was denied his constitutional right to the assistance of counsel through the admission of courtroom identifications and lineup evidence based upon lineups conducted in the absence of counsel. He also contends that the showing of photographs to the witnesses prior to the lineup was so unnecessarily suggestive and conducive to misidentification as to deny him due process of law.

There were three lineups conducted in the instant case. The first took place on August 16, 1966, the day on which defendant was arrested for his participation in the Ottilia J. incident. Eileen S. attended that lineup and immediately identified defendant as the man who had accosted her on February 14, 1966. Following the lineup she identified a photograph of defendant from a series that was shown to her by the police.

The second lineup took place on the following day, August 17, 1966. Suzanne P. and Ottilia J. attended this lineup and both made positive identifications of defendant as the man who had accosted them on July 25 and July 30, respectively. A week prior to the lineup Ottilia J. had identified a photograph of defendant from a series shown to her by police, but Suzanne P. at no time identified defendant by photograph. Ottilia J. also identified defendant's voice at a separate voice identification lineup held on the day following the visual lineup.

The third lineup took place on March 4, 1967, the day following the first day of jury selection. Marcia B. attended this lineup and made a positive identification of defendant as the man who had accosted her on June 3, 1966. She had been shown a series of photographs preceding the lineup but she had failed to identify defendant at that time.

There was no evidence that Edith B. attended any lineup or was shown photographs.

■ Because the lineups in question were conducted prior to June 12, 1967, the date of the decisions in *United States* v. *Wade* (1967) 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926] and *Gilbert* v. *California* (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951], the rules announced in those cases are not here applicable, and the evidence based upon the lineups was admissible unless defendant can demonstrate that the lineup procedures were so unfair as to constitute a denial of due process of law. (*Stovall* v. *Denno* (1967) 388 U.S. 293 [18 L.Ed.2d 1199,

87 S.Ct. 1967]; *People* v. *Feggans* (1967) 67 Cal.2d 444, 448 [62 Cal. Rptr. 419, 432 P.2d 21].) Defendant has failed to set forth any facts or arguments showing that any of the lineups was unfair, and our examination of the entire record convinces us that the procedures followed comported with due process of law. ■■■ As to the matter of photographic indentifications, we find no suggestion in the record that the procedures utilized were "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (*Simmons* v. *United States* (1968) 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253, 88 S.Ct. 967].)

Defendant next asserts that several instances of prosecutorial misconduct occurred during the guilt phase of the trial.

(1) ■■■ At one point during the direct examination of defendant his counsel momentarily went from his position near the witness stand back to the counsel table. In so doing he left on a table within defendant's reach a knife and a gun which were introduced as exhibits. At this point the prosecutor approached the witness stand and removed the knife and gun from the table. Defense counsel immediately asked to approach the bench and, out of hearing of the jury, cited the prosecutor for misconduct and moved for a mistrial. The court denied the motion for mistrial but agreed to admonish the jury in order to dispel any prejudicial effect that the prosecutor's act might have had. He also cautioned both counsel— the prosecutor to refrain from future acts of the sort complained of, and defense counsel to refrain from leaving dangerous objects within defendant's reach. The court then admonished the jury that they were not to be influenced by acts of counsel and further stated that "normally dangerous weapons are not allowed to stay on the stand there and it is the duty of the bailiff to see that they are not, but sometimes he is busy otherwise." It is clear that whatever prejudicial effect the prosecutor's act might have had on the jury was dispelled by the court's prompt admonition.

(2) ■■■ At one point in his closing argument the prosecutor, urging the jury not to be misled by defendant's modest demeanor in the courtroom, had occasion to compare that demeanor with the quality of the acts which, according to prosecution evidence, he had performed. The following argument was made: "You notice the quality of his testimony on the stand, a holiness, the empty shell of a man, a man who is motivated by some grotesque purpose, a man like who Marquis de Sade said was a sadist, a man who reveled in hearing human outcry, becoming powerful by torture and this is just typical, I submit, from the evidence in this

case, of a person who is a devotee of Marquis de Sade, a practitioner of sadism." No objection was made by defendant at this point, but the prosecutor, perhaps fearing that his rhetoric had carried him beyond the bounds of permissible argument, went on to state that his reference to the Marquis de Sade was not evidence in the case and did not represent his personal opinion but was purely argument based upon evidence before the jury. We do not consider that the prosecutor's allusion was inappropriate in view of the evidence in this case. The prosecutor certainly had a right to point out to the jury that modest behavior at one time and place, i.e., in the courtroom, is not inconsistent with depraved conduct under other circumstances, and his recourse to history and literature to make this point was not improper in the circumstances. Moreover, as indicated above, defendant failed to object to the allusion in question.

(3) ▮▮ It is alleged by the defendant that his discovery rights were infringed when the prosecution refused to allow a pretrial interview with "an important defense witness" and refused to provide the defense with the address of said witness. The witness in question, Mary McC., was the daughter of Ottilia J. and she testified at trial for the *prosecution* relative to her mother's condition after the attack upon her and also relative to certain abortive attempts made by her mother to avoid testifying at trial. It is difficult to understand how Mrs. McC. might be considered "an important defense witness." Moreover, even if she were considered such by the defense, and even if defendant was denied substantial discovery rights as to her, the record does not reflect any effort on defendant's part to enforce such rights. Accordingly, we cannot allow him to raise the matter at this time.[16]

▮▮ Defendant next contends that it was error for the trial court to exclude evidence to the effect that he had taken a polygraph test to prove his innocence. He realizes that the results of such a test are not admissible evidence in a court of law (see *People* v. *Jones* (1959) 52 Cal.2d 636, 653 [343 P.2d 577]),[17] but he contends that evidence of his *willingness*

---

[16]The People, recognizing the peculiar inappositeness of this contention in relation to Mary McC., suggest that the defense might have mistakenly named Mrs. McC. when it meant Mary McNamee, a witness who testified for the prosecution to the effect that defendant was an habitué of the garage in whose parking lot the initial assaults on Ottilia J. took place. However, defendant has not indicated that the surmise of the People is correct, in spite of ample opportunity to do so, and we therefore conclude that defendant intends that the contention be considered only in relation to Mary McC. Out of an abundance of caution we have considered the contention in relation to Mary McNamee and have concluded that no prejudicial abuse of defendant's discovery rights occurred.

[17]But compare *United States* v. *Ridling* (E.D.Mich. 1972) 350 F.Supp. 90.

to take such a test should be admissible as "a badge of innocence." We rejected a similar contention in *People* v. *Carter* (1957) 48 Cal.2d 737 [312 P.2d 665]. There a former suspect in the crime for which defendant was on trial made a statement that he, the suspect, had been willing to take a lie detector test in the matter. The statement was admitted into evidence, thereby raising "the implication . . . that defendant had refused to take a lie detector test and that his refusal furnished some evidence of guilty knowledge." (48 Cal.2d at p. 752.) We held that the admission of the statement was error, reasoning that because lie detector tests themselves are not considered reliable enough to have probative value, "a suspect's willingness or unwillingness to take such a test is likewise without enough probative value to justify its admission. The suspect may refuse to take the test, not because he fears that it will reveal consciousness of guilt, but because it may record as a lie what is in fact the truth. A guilty suspect, on the other hand, may be willing to hazard the test in the hope that it will erroneously record innocence, knowing that even if it does not the results cannot be used as evidence against him." (48 Cal.2d at p. 752.) This reasoning is applicable to the instant contention; the proffered evidence was properly excluded.

■ Defendant contends that he was deprived of a fair trial because a photograph introduced into evidence by the defense was lost by the clerk of the court after its admission and was therefore not available to the jury for comparison with photographs of defendant. It will be remembered that defendant, through the testimony of one Robert L. Thornton, sought to establish that a person by the name of Ron Franks, who resembled defendant in certain respects, was an habitué of the garage or service station near which was parked the car to which Ottilia J. was taken immediately after her abduction. In the course of Robert L. Thornton's testimony the defense introduced two photographs of Ron Franks, but one of these was subsequently lost by the clerk of the court, and all counsel thereafter refused to stipulate that a mug shot be substituted in its place. It is defendant's contention that the loss of the subject photograph deprived him of a fair trial because it severely hampered his efforts to convince the jury that Ron Franks, and not he, was the malefactor in the Ottilia J. incident.

It is clear that defendant's reliance on *In re Cameron* (1968) 68 Cal.2d 487 [67 Cal.Rptr. 529, 439 P.2d 633], is misplaced. That case, and the authorities cited at page 504 of the opinion, deal with the alleged suppression of evidence *by the prosecution or police*. Defendant does not even seek to raise an innuendo that the prosecutor or the police were responsible for the disappearance of the subject picture in this case; all parties

agree that it was the court clerk who was at fault. Moreover, one of the two photographs of Ron Franks remained in evidence for the consideration of the jury, and there is no contention that the lost photograph was other than cumulative of the remaining one.

 Apropos this point defendant contends that it was error for the court to instruct the jury in the terms of CALJIC No. 23 to the effect that neither party was required to produce as witnesses all persons who, according to the evidence, might have knowledge or information in the premises. Defendant urges that this instruction does not accurately state the law in cases where it is shown that the prosecution suppressed a witness or evidence. We hasten to agree with that proposition in the abstract, but we fail to see its application to the instant case, where there was absolutely no suggestion that the prosecution knew of the whereabouts of Ron Franks or was intentionally withholding him as a witness. In such circumstances it was proper to inform the jury that no adverse inference should be drawn against either party by the failure of Ron Franks to testify. (See *People* v. *Avila* (1967) 253 Cal.App.2d 308, 325, fn. 11 [61 Cal.Rptr. 441], and cases there cited.)

 Defendant contends that the court failed to give complete instructions as to the intentional elements requisite to the charged crimes. In particular he urges that the trial court erred in refusing to give his proffered instruction, based upon CALJIC No. 27-A, to the effect that a specific intent was required in each of the eight charged offenses, including the two counts of sexual perversion (Pen. Code, § 288a), the one count of simple kidnaping (Pen. Code, § 207), and the one count of sodomy (Pen. Code, § 286). This contention is without merit. None of the indicated crimes requires other than a general criminal intent. (See *People* v. *Oliver* (1961) 55 Cal.2d 761, 765 [12 Cal.Rptr. 865, 361 P.2d 593], and *People* v. *Fernandes* (1932) 127 Cal.App. 45 [15 P.2d 172] [§ 207]; *People* v. *Giani* (1956) 145 Cal.App.2d 539, 546 [302 P.2d 813], and *People* v. *Avanzi* (1938) 25 Cal.App.2d 301, 302 [77 P.2d 237] [§ 288a]; *People* v. *Gann* (1968) 259 Cal.App.2d 706, 711-712 [66 Cal.Rptr. 508] [§ 286].) The version of CALJIC No. 27-A given by the court instructed the jury that it could not find defendant guilty of either of the two counts of kidnaping for the purpose of robbery (§ 209) unless it found a specific intent to commit robbery; and that it could not find defendant guilty of either of the two counts of robbery unless it found that he had the specific intent to permanently deprive the owner thereof of his personal property by force or fear. Because these counts were the only ones requiring a specific intent the instruction was proper. Moreover, we have carefully examined all of the instructions given on the

issue of intent and have found them to be clear, comprehensive, and accurate.

 Defendant contends the court erred in giving an adapted version of CALJIC No. 29 (re-revised), which generally speaking instructs the jury that it is the sole judge of the truth or falsity of extrajudicial admissions or confessions introduced against the defendant.

First defendant urges that there was no basis in the evidence for this instruction because he made no extrajudicial confessions of any of the charged crimes. It appears, however, that in the course of the trial the prosecution introduced several extrajudicial statements which defendant had made to police officers during the investigation of the various charged offenses. These statements were largely exculpatory, but they contained admissions having some damaging effect. Moreover, the prosecution introduced into evidence over defendant's objection a full confession of guilt in the Edith B. incident which he made when he was arrested in that matter on June 23, 1966. Clearly an instruction was appropriate to insure proper consideration by the jury of this confession and defendant's various other extrajudicial statements. Defendant's sole objection at trial to the use of CALJIC No. 29 for this purpose was directed to that portion thereof which defines a confession as "a statement by a defendant which discloses his intentional participation *in the criminal act for which he is on trial* and which discloses his guilt of that crime." (Italics added.) The court, in order to avoid any suggestion that defendant had confessed to any of the charged offenses, eliminated the italicized language and substituted therefor ". . . in a criminal act." The adaptation was proper in the circumstances and the instruction as given was clearly correct.

 Defendant further urges, however, that if the court was to give any instructions on confessions it should also have given an instruction to the effect that the jury should not consider the confession unless it first determined that it was freely and voluntarily made. This contention is without merit. It appears, that, prior to the presentation of the Edith B. confession before the jury, the court held a hearing outside the presence of the jury wherein defendant and the police officer involved gave testimony; and that at the conclusion of that hearing the court ruled that the confession was obtained in a manner consistent with defendant's constitutional rights and was free and voluntary. Because trial in the instant case was commenced[18] subsequent to January 1, 1967, the provisions of the Evidence Code were applicable (Evid. Code, § 12), and

---

[18]See Evidence Code section 12, subdivision (b)(1).

section 405 of that code[19] clearly indicates that the court's decision on the issue of admissibility of confessions is final and not subject to a "second look" by the jury as was the case under former law. (See generally Comment—Assembly Committee on Judiciary, Evid. Code, § 405.) Thus, although the weight and credibility to be accorded an admitted confession remain questions for the jury (see Evid. Code, § 406), its admissibility does not. Accordingly, the court herein properly declined to instruct the jury that it should consider the Edith B. confession only after determining that it was freely and voluntarily made.

Defendant next contends that our decision in *People* v. *Daniels* (1969) 71 Cal.2d 1119 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677] necessitates reversal of the three kidnaping counts. The People have conceded that reversal is required as to count VII, charging violation of section 207 in the Suzanne P. incident. Because the sexual assault there took place wholly within the confines of a single room in a laundromat, any asportation involved was not " 'into another part of the same county' " within the meaning of section 207. (*People* v. *Daniels, supra,* 71 Cal.2d 1119, 1140; *Cotton* v. *Superior Court* (1961) 56 Cal.2d 459, 465 [15 Cal.Rptr. 65, 364 P.2d 241]; *People* v. *Rocco* (1971) 21 Cal.App.3d 96, 105 [98 Cal.Rptr. 365].) We therefore turn our attention to each of the two section 209 violations of which defendant was convicted in order to determine whether, in the words of *Daniels,* "the movements of the victim [were] merely incidental to the commission of the robbery and [did] not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself." (*Id.* at p. 1139.)

In the incident involving Eileen S. defendant forced his way into the victim's car and, seizing her around the throat with his arm, informed her that he wanted her money. Rather than carrying out the robbery at that location, however, defendant started the car and drove the victim several

---

[19]Section 405 provides: "With respect to preliminary fact determinations not governed by Section 403 or 404:

"(a) When the existence of a preliminary fact is disputed, the court shall indicate which party has the burden of producing evidence and the burden of proof on the issue as implied by the rule of law under which the question arises. The court shall determine the existence or nonexistence of the preliminary fact and shall admit or exclude the proffered evidence as required by the rule of law under which the question arises.

"(b) If a preliminary fact is also a fact in issue in the action:

"(1) The jury shall not be informed of the court's determination as to the existence or nonexistence of the preliminary fact.

"(2) If the proffered evidence is admitted, the jury shall not be instructed to disregard the evidence if its determination of the fact differs from the court's determination of the preliminary fact."

blocks—steering with one hand while keeping her pinioned to the seat by means of his arm around her throat. After parking the car defendant took the victim's money and then proceeded with a sexual assault upon her.

In the incident involving Ottilia J. defendant approached the victim from the rear while she was standing outside a tavern, held a pistol at her back, and ordered her to walk down the street with him. He walked her thus at gunpoint approximately one block to a car parked behind a service station and forced her to enter it. There he ordered her to disrobe and, when she had done so, took money from her purse. Then defendant commenced a sexual assault which lasted several hours.

It is clear that the asportation of the victim in each of these cases was not "merely incidental to the commission of the robbery" and that such movement "substantially increase[d] the risk of harm over and above that necessarily present in the crime of robbery itself." ██ The fact that in each case defendant chose to consummate the robbery at a location remote from the place of initial contact does not render the subsequent asportation "merely incidental" to the crime, for it is the very fact that defendant utilized substantial asportation in the commission of the crime which renders him liable to the increased penalty of section 209 if that asportation was such that the victim's risk of harm was substantially increased thereby. Clearly, any substantial asportation which involves forcible control of the robbery victim such as that occurring in this case exposes her to grave risks of harm to which she would not have been subject had the robbery occurred at the point of initial contact.[20]

---

[20]The concurring and dissenting opinion, which prefers to approach the problem from the standpoint of inadequate instructions, urges that because the kidnaping instructions given at trial (which took place some two years prior to the *Daniels* decision) were erroneous from the standpoint of *Daniels,* and because as a result "a material issue was withheld from [the jury's] consideration," the error in instructing the jury was prejudicial per se under the reasoning of *People* v. *Modesto* (1963) 59 Cal.2d 722, 730 [31 Cal.Rptr. 225, 382 P.2d 33], and *People* v. *Sedeno* (1974) 10 Cal.3d 703, 720 [112 Cal.Rptr. 1, 518 P.2d 913]. It is curious to note at the outset that *Daniels* itself did not approach the problem from this standpoint but instead looked to the record before it to determine as a matter of law whether the defendants' acts constituted section 209 kidnaping under the *Daniels* definition (see *Daniels* at pp. 1140 and 1143, especially the concluding sentence of the first full paragraph on page 1143; see also *People* v. *Williams* (1970) 2 Cal.3d 894, 901-904 [88 Cal.Rptr. 208, 471 P.2d 1008]; *People* v. *Stathos* (1971) 17 Cal.App.3d 33, 35-40 [94 Cal.Rptr. 482]; *People* v. *Miller* (1970) 12 Cal.App.3d 922, 932-934 [91 Cal.Rptr. 97]; *People* v. *Dacy* (1970) 5 Cal.App.3d 216, 222-223 [85 Cal.Rptr. 57]; *People* v. *Schafer* (1970) 4 Cal.App.3d 554, 560-561 [84 Cal.Rptr. 464]; *People* v. *Thomas* (1970) 3 Cal.App.3d 859, 865-866 [83 Cal.Rptr. 879]; cf. *People* v. *Shirley* (1970) 10 Cal. App.3d 268, 271-275 [88 Cal.Rptr. 853]; *People* v. *Chavez* (1970) 4 Cal.App.3d 832,

██ Defendant finally contends that there was error of the type condemned by us in *People* v. *Tribble* (1971) 4 Cal.3d 826 [94 Cal.Rptr. 613, 484 P.2d 589]. In that case the court instructed the jury that it was not essential to violation of section 209 that the defendant " 'shall have intended to commit robbery at the time of first contacting the complaining witness. It is sufficient even if the intent to commit robbery was formed later but during the progress of the kidnapping.' " (*Id.* at p. 830.) We held that this instruction was improper. The 1951 amendment to section 209, we pointed out, not only made asportation an element of the crime but also abrogated the rule of *People* v. *Brown* (1947) 29 Cal.2d 555, 558 [176 P.2d 929] and required that the intent to rob be formed prior to the commencement of asportation. The instruction in *Tribble,* which was based on the *Brown* rule, was therefore held to be erroneous, requiring reversal.

In the instant case no instruction of the kind condemned in *Tribble*

839 [84 Cal.Rptr. 783]; *People* v. *Ramirez* (1969) 2 Cal.App.3d 345, 354-357 [82 Cal.Rptr. 665].) But even if we were now to adopt such an "instruction approach," it is difficult to mine from the concurring and dissenting opinion the precise rationale which is sought to be suggested. On the one hand the opinion seems to intimate that the error here was in the giving of *wrong instructions.* If that is so, such an error was clearly nonprejudicial because, as we have indicated, it is not reasonably probable that a jury which was fully instructed according to *Daniels* would have reached a result more favorable to defendant. (See *People* v. *Watson* (1956) 46 Cal.2d 818, 837 [299 P.2d 243]; Cal. Const., art. VI, § 13.) Seeking to avoid this result, the concurring and dissenting opinion attempts to cast the error as one of *omission* in order to avail itself of the "prejudicial per se" doctrine of *Modesto* and *Sedeno.* Thus, it is asserted, the instructions in this case operated to withhold from the jury a material issue—i.e., whether or not the movement was "merely incidental to the robbery and did not substantially increase the risk of harm"—and, the argument concludes, "the denial of the right to have that issue determined by the jury constitutes a miscarriage of justice and requires reversal." Unfortunately, however, this new perspective achieves no different result. *Modesto* and *Sedeno* indeed hold that "a defendant has a constitutional right to have the jury determine every material issue presented by the evidence." (*Modesto, supra,* at p. 732; *Sedeno, supra,* at p. 720) and that the failure to instruct on such an issue is prejudicial per se. Such a "material issue" is "presented by the evidence" within the meaning of those cases when the record contains "any evidence deserving of any consideration whatsoever" relative to it. (*Modesto, supra,* at p. 727; *People* v. *Carmen* (1951) 36 Cal.2d 768, 773 [228 P.2d 281].) Conversely, however, no such issue is presented when there is *no* evidence deserving of consideration relative to it in the record. (*People* v. *Morse* (1969) 70 Cal.2d 711, 731-736 [76 Cal.Rptr. 391, 452 P.2d 607]; *People* v. *Saterfield* (1967) 65 Cal.2d 752, 760 [56 Cal.Rptr. 338, 423 P.2d 266]; *People* v. *Davidson* (1969) 1 Cal.App.3d 292, 301-302 [81 Cal.Rptr. 529].) In the instant case we hold as a matter of law that defendant's acts constituted section 209 kidnaping under *Daniels*—i.e., that the asportation to which defendant subjected each of his victims *was not* merely incidental to the crime of robbery and *did* substantially increase the risk of harm—and that there is no evidence worthy of consideration to the contrary. Thus, even if we utilize the new-found "instruction approach" of the concurring and dissenting opinion, and regardless of whether we characterize the "error" resulting from the lack of *Daniels* instructions as one of commission or one of omission, it is manifest that no ground for reversal appears.

was given. Moreover, while there was no instruction explicitly requiring the jury to fix the time at which the intent to rob was formed in relation to the commencement of asportation, the instructions given, read as a whole, fairly informed the jury that in order to find defendant guilty of violation of section 209 they must find that the asportation was undertaken with the intent and purpose of robbery—without regard to whatever other intents and purposes the defendant might also have had.[21] These instructions correctly stated the law. There was no *Tribble* error.

The judgment is reversed as to count VII (simple kidnaping in violation of § 207 of the Pen. Code). The judgment is modified insofar as it provides for the penalty of death to provide for a punishment of life imprisonment without possibility of parole. In all other respects the judgment is affirmed.

Wright, C. J., Burke, J., and Clark, J., concurred.

**MOSK, J.**—I agree that the judgment in this case should be affirmed on all the nonkidnaping counts, and should be reversed as to count VII (simple kidnaping in violation of Pen. Code, § 207). I dissent, however, from the affirmance on counts I and V, convicting defendant of kidnaping for the purpose of robbery in violation of Penal Code section 209.

On the latter counts the majority review the testimony of the victims "in order to determine whether" the evidence is sufficient to show commission of the crime of aggravated kidnaping. (*Ante,* pp. 767-768.) But sufficiency of the evidence is not the issue on this appeal. Rather, the fatal defect in the trial of counts I and V is that the instructions withheld from the jury an essential element of the crime of kidnaping. The court told the jury that "To constitute kidnaping there must be a carrying away or otherwise forcible moving for *some* distance of the person who against her will is stolen or taken into the custody or control of another person, *but it is the fact, not the distance, of forcible removal that constitutes kidnaping. The movement may be of a few feet or any greater distance to constitute kidnaping.*" (Italics added.)[1]

---

[21]Among the instructions given was the following based on CALJIC No. 656: "An essential element of the crime charged against the defendant in counts I and V of the information is a specific intent to kidnap or carry away a person to commit robbery. This intent must be a motivating purpose of the action, although it need not be the only such purpose."

[1]The error was compounded by the succeeding instruction, which in defining the movement requisite for a conviction of simple kidnaping told the jury that "the law does not require that the one thus stolen or taken be carried or moved a long distance or any particular distance."

The emphasized language, of course, is not the law. It states the so-called "*Chessman* rule," which we held in *People* v. *Daniels* (1969) 71 Cal.2d 1119 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677], to be an erroneous construction of the aggravated kidnaping statute. Its vice, as we there explained, is that it permits a verdict of guilt on the basis of a "criminologically nonsignificant circumstance." (*Id.* at p. 1138.) Accordingly, we required in *Daniels* (at p. 1139) that to convict a defendant of violating section 209 the jury must find that the movements he compelled the victim to perform were significant displacements in space or time and substantially increased the risk of physical harm to the victim over and above that necessarily present in the crime of robbery.[2]

In stark contrast, here the jury was told it could convict the defendant of aggravated kidnaping merely on proof that with intent to rob he moved his victim "a few feet." The jury was not required to consider the length or duration of the movement, nor to find any increase whatever in the risk of harm caused by that movement, less still a substantial increase in the risk. Yet these are essential elements, under *Daniels,* of the offense of kidnaping for the purpose of robbery.[3]

I turn now to the legal consequences of these errors of omission and commission. It is settled that "the defendant has a constitutional right to have the jury determine every material issue presented by the evidence. Regardless of how overwhelming the evidence of guilt may be, the denial of such a fundamental right cannot be cured by article VI, section 4½ [now § 13], of the California Constitution, for the denial of such a right itself is a miscarriage of justice within the meaning of that provision." (*People* v. *Modesto* (1963) 59 Cal.2d 722, 730 [31 Cal.Rptr. 225, 382 P.2d 33], and cases cited.)

Failure to instruct on a lesser included offense of which the defendant could have been convicted under the evidence, as in *Modesto,* constitutes a denial of that right. But we have repeatedly held that the same rule applies to a failure to instruct, as here, on an essential element of the offense actually charged. For example, in *People* v. *Conley* (1966) 64

---

[2] It is settled that the *Daniels* rule applies to cases, as here, pending on appeal when *Daniels* was decided. (*People* v. *Williams* (1970) 2 Cal.3d 894, 900-901 [88 Cal.Rptr. 208, 471 P.2d 1008], and cases cited.)

[3] I note that in its recent enactment restoring the death penalty in California the Legislature has expressly adopted the *Daniels* construction of the law of kidnaping: new Penal Code section 190.2, subdivision (b)(3)(ii), declares that "Brief movements of a victim which are merely incidental to the commission of another offense and which do not substantially increase the victim's risk of harm over that necessarily inherent in the other offense do not constitute kidnapping within the meaning of this paragraph." (Stats. 1973, ch. 719, § 5.)

Cal.2d 310, 318 [49 Cal.Rptr. 815, 411 P.2d 911], instructions were given in a murder trial on deliberation and premeditation, but "The jury was not advised that malice was also an essential element of murder." The defendant produced evidence of diminished capacity, but no instructions on that subject were given either. We reasoned (at pp. 319-320), "Since the jury was not advised that diminished capacity could negate the existence of malice and that if malice were absent the offense could not be murder, a material issue was withheld from its consideration. The denial of the right to have a significant issue determined by the jury is in itself a miscarriage of justice within the meaning of article VI, section 4½, of the Constitution and requires reversal."[4]

By parity of reasoning, in the case at bar the jury was not advised that if the element of significant asportation were absent—i.e., if the movement were merely incidental to the robbery and did not substantially increase the risk of harm—the offense could not be aggravated kidnaping. Accordingly, a material issue was withheld from its consideration, and the denial of the right to have that issue determined by the jury constitutes a miscarriage of justice and requires reversal.

A fortiori is this true when the court not only fails to give the right instruction on an essential element of the offense charged, but actually gives the wrong instruction. Thus in *People* v. *Graham* (1969) 71 Cal.2d 303, 315-316 [78 Cal.Rptr. 217, 455 P.2d 153], the defendant in a murder trial introduced evidence of diminished capacity and we held that the court's failure to instruct on the offense of "nonstatutory voluntary manslaughter" as defined in *People* v. *Conley* (1966) *supra*, 64 Cal. 2d 310, 324-326 and footnote 4, denied him a jury trial on the issue and hence was prejudicial per se. In addition, however, the court in effect instructed the jury that no conviction of voluntary manslaughter would be permissible if there were evidence of deliberation and premeditation. On this point we observed (71 Cal.2d at p. 315, fn. 3), "The court's error of omission of the complete *Conley* instruction was thus severely compounded by its affirmative misstatement that a deliberate homicide cannot be reduced by diminished mental capacity to the offense of voluntary manslaughter."

Similarly, in the present case the court's error of omission in failing to instruct on the essential element of significant asportation was severely

---

[4]The same analysis compels reversal when the issue of malice is withheld from the jury because of an erroneous reliance on the felony-murder rule. (See, e.g., *People* v. *Phillips* (1966) 64 Cal.2d 574, 584-585 [51 Cal.Rptr. 225, 414 P.2d 353]; *People* v. *Gilbert* (1965) 63 Cal.2d 690, 703-704 [47 Cal.Rptr. 909, 408 P.2d 365].)

compounded by its affirmative misstatement that "it is the fact, not the distance," of forcible movement that constitutes kidnaping, and that movement may therefore be as little as "a few feet."

In *People* v. *Sedeno* (1974) 10 Cal.3d 703, 720 [112 Cal.Rptr. 1, 518 P.2d 913], we expressly reaffirmed that portion of *Modesto* which held that "a defendant has a constitutional right to have the jury determine every material issue presented by the evidence," and a denial of that right cannot be cured by weighing the evidence and finding it not reasonably probable that a correctly instructed jury would have reached a different verdict. We overruled, however, the second branch of the *Modesto* holding, which declared (at p. 731 of 59 Cal.2d) that the error cannot be cured by examining the verdict in the light of the instructions given and finding that the jury necessarily resolved, although in a different setting, the same factual question that would have been presented by the missing instruction. Rather, we held that "in some circumstances it is possible to determine that although an instruction on a lesser included offense was erroneously omitted, the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. In such cases the issue should not be deemed to have been removed from the jury's consideration since it has been resolved in another context, and there can be no prejudice to the defendant . . . ." (10 Cal.3d at p. 721.)

In the case before us the court's failure to advise the jury of the essential element of significant asportation cannot be cured by a similar analysis. No other instruction correctly defining kidnaping was given (see fn. 1, *ante*), and the factual question posed by the omitted instruction was neither presented to nor resolved by the jury in any other context. It follows that the issue remained withdrawn from the jury's consideration and the error is prejudicial under *Sedeno* as well.

Directly in point is our decision in *People* v. *Tribble* (1971) 4 Cal.3d 826 [94 Cal.Rptr. 613, 484 P.2d 589], which dealt with another essential element of the same offense, kidnaping for the purpose of robbery. Construing the same legislation as we did in *Daniels*—the 1951 amendment to section 209—we held that to convict a defendant of this crime the jury must also find that he entertained the specific intent to rob his victim at the time the kidnaping commenced. The trial court not only failed to so inform the jury, but erroneously instructed that "it is not necessary that the perpetrator shall have intended to commit robbery at the time of first contacting the complaining witness. It is sufficient even

if the intent to commit robbery was formed later but during the progress of the kidnaping."

The parallel between *Tribble* and the case at bar is clear. In each an essential element of the crime of kidnaping for the purpose of robbery was withheld from the jury, while a wholly erroneous instruction on the subject was given. Equally clear is our treatment in *Tribble* of the legal consequences of this error. Contrary to the technique now adopted by the majority, we did not undertake to examine the evidence in order to determine whether the defendant's intent to rob had in fact been formed at the outset of the kidnaping, so that the judgment might be affirmed despite the incorrect instructions. Instead, we forthrightly concluded (at p. 832) that "In the present case defendant was entitled to have the jury determine whether he intended to commit robbery at the time the kidnaping commenced or whether the intent to commit robbery was an afterthought to a kidnaping that was sexually motivated. The instructions took this issue from the jury, and the error was therefore prejudicial."

Here, too, defendant was "entitled to have the jury determine" whether the asportation was more than merely incidental to the robbery and whether it substantially increased the risk of harm. As in *Tribble*, "the instructions took this issue from the jury, and the error was therefore prejudicial."

In concluding otherwise, the majority substitute this court for the jury, reweigh the evidence, and decide a critical issue which was never submitted to the trier of fact. For the reasons here explained, the ruling violates the letter and spirit of our decisions in *Tribble, Sedeno, Graham, Conley,* and *Modesto.*

In their footnote 20 (*ante,* pp. 768-769), the majority attempt to distinguish the foregoing cases by claiming there was insufficient evidence to bring their doctrine into play. Again, the question is not mere insufficiency. As the majority concede, "a 'material issue' is 'presented by the evidence' within the meaning of those cases when the record contains 'any evidence deserving of any consideration whatsoever' relative to it."[5] Do the ma-

---

[5]The language is from *People* v. *Carmen* (1951) 36 Cal.2d 768, 773 [228 P.2d 281], quoting from *People* v. *Burns* (1948) 88 Cal.App.2d 867, 871 [200 P.2d 134]. The remainder of this well-known quotation is also worth recalling here: "The fact that the evidence may not be of a character to inspire belief does not authorize the refusal of an instruction based thereon. [Citations.] That is a question within the exclusive province of the jury. However incredible the testimony of a defendant may be he is entitled to an instruction based upon the hypothesis that it is entirely true." (Italics omitted.) The wording has been much quoted and applied in our decisions. (See, e.g., *People* v. *Miller* (1962) 57 Cal.2d 821, 829 [22 Cal.Rptr. 465, 372 P.2d

jority seriously believe—more importantly, can they seriously ask the bench and bar to believe—that in the case before us there was absolutely no evidence "deserving of any consideration whatsoever" from which a jury could have found defendant *not guilty* of aggravated kidnaping under *Daniels*? The idea is preposterous, as any open-minded reading of the record will show.

To begin with, in their footnote 20 the majority "hold as a matter of law . . . that the asportation to which defendant subjected each of his victims *was not* merely incidental to the crime of robbery" (italics in original). The "incidental movement" test is taken from *Daniels*, and through it, from *Cotton v. Superior Court* (1961) 56 Cal.2d 459, 464-465 [15 Cal.Rptr. 65, 364 P.2d 241]. As we explained in *Daniels*, a brief movement of the victim for the purpose of facilitating the commission of a robbery is incidental thereto and cannot be considered a taking "into another part of the same county" within the meaning of the statutory definition of kidnaping (Pen. Code, § 207). (71 Cal.2d at pp. 1130-1131; accord, *People v. Williams* (1970) 2 Cal.3d 894, 902 [88 Cal.Rptr. 208, 471 P.2d 1008]; *People v. Timmons* (1971) 4 Cal.3d 411, 414 [93 Cal. Rptr. 736, 482 P.2d 648].) With this definition in mind let us look at the evidence, which for a pre-*Daniels* trial is unusually clear on this point.

Eileen S. testified that defendant entered her vehicle while it was standing in a drugstore parking lot on the corner of Florence Avenue and Tweedy Street in the City of Downey. After commandeering her car he drove out of the parking lot, along Tweedy to its intersection with Dacosta Street, turned left for one block, then made a U-turn and came back to that same intersection. There he parked the car and committed the robbery and rape. I have retraced this movement on a standard street map: from the parking lot to the corner of Tweedy and Dacosta is two short city blocks, and from that corner to the point where defendant turned around and returned to Tweedy and Dacosta is another short city block. Thus the total distance covered was four short blocks, and the robbery and rape actually occurred only two such blocks from the place where the asportation began.

The movement of Ottilia J.—insofar as it was relevant to the charge of kidnaping for the purpose of robbery—was even briefer. Defendant accosted Mrs. J. outside the Wagon Wheel Bar on the corner of San Gabriel Boulevard and Dorothy Street in South San Gabriel, and forced

297]; *People v. Modesto* (1963) *supra,* 59 Cal.2d 722, 729; *People v. Henderson* (1963) 60 Cal.2d 482, 490 [35 Cal.Rptr. 77, 386 P.2d 677]; *People v. Jeter* (1964) 60 Cal.2d 671, 674 [36 Cal.Rptr. 323, 388 P.2d 355]; *People v. Wilson* (1967) 66 Cal.2d 749, 762 [59 Cal.Rptr. 156, 427 P.2d 820]; *People v. Morse* (1969) 70 Cal. 2d 711, 732 [76 Cal.Rptr. 391, 452 P.2d 607].)

her to walk to the corner of San Gabriel Boulevard and Hellman Avenue. At that location they entered a car behind a service station, where defendant committed the robbery and began his sexual assault. The total distance covered, again according to the street map, was exactly one block.

These facts are not in dispute: the Attorney General does not claim, for example, that the distance from Dorothy Street to Hellman Avenue on San Gabriel Boulevard is more than one block. Being unable to stretch the movements of the victims, the majority instead grossly exaggerate their significance. Thus the opinion (*ante,* p. 768) characterizes the movements as "substantial," but fails in any way to justify this conclusionary appellation. Worse yet, the opinion asserts (*ibid.*) that "in each case defendant chose to consummate the robbery at a location *remote* from the place of initial contact" (italics added). But in one case that distance was one block and in the other it was two blocks; in the context of the law of kidnaping, is this a fair usage of·the word "remote"?[6] I believe, rather, that in each instance the displacement of the victim amounted to no more than a brief movement for the purpose of facilitating the robbery and hence was incidental thereto within the meaning of *Daniels.*

Even more critical is the effect of the majority's holding that "as a matter of law" the movements in the case at bar were not incidental to the underlying crimes. This is the equivalent, of course, of ruling that no jury could lawfully have found otherwise. But can this fairly be said on the record before us? Is the undisputed testimony describing the movements of the victims really "deserving of no consideration whatsoever"? The suggestion is self-refuting. Obviously a properly instructed jury could conclude from these facts that either or both movements in the case at bar—covering one and four city blocks—were so brief that they did not extend "into another part of the same county" and hence were not kidnaping.

Nor can the majority avoid the pernicious consequences of their ruling. Consider for example the case of Ottilia J. On what authority do the majority hold as a matter of law that a jury must necessarily find that a movement of only one city block is an asportation "into another part of the same county"? The majority do not deign to tell us. This is not surprising, as there is no such authority. The statute says no more than the words here quoted, and there is certainly no support for this proposition

---

[6]In my dictionary, as I assume in that of the majority, the principal meanings of "remote" are: "separated by intervals greater than usual: far apart; far removed in space, time, relation, or likeness: not near or immediate: far, distant." (Webster's Third New Internat. Dict. (1961) p. 1921.)

in the *Daniels* opinion or any subsequent decision of this court. Rather, in *Daniels* we recognized that "an effort to define the phrase, 'another part of the same county,' in terms of a specific number of inches or feet or miles would be open to a charge of arbitrariness." (71 Cal.2d at p. 1128.) Here the majority have in effect defined that distance as a minimum of one city block, which is no less arbitrary a measure than those condemned in *Daniels*. And being arbitrary, this severe limitation on the terms of the statute constitutes judicial legislation of the most blatant kind.

I turn next to the second branch of the majority's holding, i.e., that as a matter of law "any substantial asportation which involves forcible control of the robbery victim such as that occurring in this case exposes her to grave risks of harm to which she would not have been subject had the robbery occurred at the point of initial contact." (Fn. omitted; *ante,* p. 768.) Once again the majority are secretive in their reasoning, and do not deign to tell us what are the "grave risks of harm" they have in mind. The law on this point, however, is settled: in *Daniels* (71 Cal.2d at p. 1139) we held the Legislature intended to exclude from the reach of section 209 movements which "do not *substantially* increase the risk of harm over and above that necessarily present in the crime of robbery itself." (Italics added.) And "In *People* v. *Timmons* (1971) 4 Cal.3d 411 [93 Cal. Rptr. 736, 482 P.2d 648], we stated that the *Daniels* risk-of-harm test referred 'to an increase in the risk that the victim may suffer *significant* physical injuries over and above those to which the victim of the underlying crime is normally exposed.' (*Id.,* at p. 414.)" (Italics added.) (*People* v. *Beamon* (1973) 8 Cal.3d 625, 636 [105 Cal.Rptr. 681, 504 P.2d 905].)

We cannot deduce the intent of the majority from the first portion of the quoted sentence of their opinion, to-wit, that such grave risks of harm are caused by substantial asportation "which involves forcible control of the robbery victim . . . ." Forcible control, as this court recently and unanimously held, is an essential ingredient of *all* kidnaping under California law. (*People* v. *Stephenson* (1974) 10 Cal.3d 652, 659-660 [111 Cal.Rptr. 556, 517 P.2d 820].) It follows that a definition couched merely in terms of forcible control fails to distinguish between simple and aggravated kidnaping. Accordingly, the majority cannot mean that the use of any kind of forcible control whatever will necessarily expose the victim to the dangers required to support a conviction under section 209.

We are left, therefore, with the majority's qualifying reference to forcible control "such as that occurring in this case . . . ." To understand that allusion it is evidently necessary to look again at the record.

Defendant's method of "controlling" Eileen S. while moving her to the

place of the robbery was to hold her with his right arm around her neck while steering her car with his left arm.[7] What "grave risks of harm" did Miss S. thereby incur? To begin with, surely the majority do not mean she risked asphyxiation. Defendant told her at the outset, "I am not going to hurt you." There is not a word of testimony suggesting that while the car was moving defendant attempted to choke or strangle her, or did so accidentally. On the contrary, the only inference that can be drawn from the record is that defendant put his arm around Miss S.'s neck for the simple purpose of preventing her from escaping or identifying him.

Perhaps the majority mean, instead, that by restraining Miss S. in this manner defendant created a risk that (1) he might lose control of the car, (2) a collision or other accident might ensue, and (3) Miss S. might be injured in such a mishap. This scenario *might* have come true, of course; even the most careful driver is daily exposed to the *possibility* of accident and injury. But in the case before us the question is whether there was a *substantial* risk, within the meaning of *Daniels,* that such a result would actually occur.

We find guidance in recent decisions of this court and the Court of Appeal. In *People* v. *Milan* (1973) 9 Cal.3d 185 [107 Cal.Rptr. 68, 507 P.2d 956], the defendant commandeered at gunpoint the taxicab in which he was riding. He first held his gun against the back of the head of a trainee riding in the front passenger seat. The driver intentionally ran a stop sign in an attempt to attract the attention of the police. The defendant shot a hole through the windshield, shifted his gun to the back of the driver's head, and told the latter that the next bullet would be for him and to "stop looking for stop signs, and if a police vehicle shows up, you're dead." The driver nevertheless continued to try to capture police attention by committing additional traffic violations, including going through two or three more stop signs, speeding, and running a red light. On an appeal from a judgment of conviction of violating section 209, we reasoned (at p. 193): "In these circumstances the jury was warranted in finding that the asportation substantially increased the risk of harm beyond that inherent in the crime of robbery.[8] The asportation gave rise to dangers, not inherent in robbery, that a traffic collision would occur and that as a result of the motion of the car the gun would accidentally discharge. The

---

[7] Miss S. testified, "He reached over, put his arm around my neck and pushed me to my right side. . . . He got into the car, shut the door, started the car and drove out of the parking lot with his arm remaining around my neck." In addition, he held her so that "It turned my head to my right side," i.e., away from him.

[8] In a footnote at this point we observed that the jury had been instructed in terms of the *Daniels* decision, unlike the circumstances of the instant case.

fact that neither of these dangers materialized, of course, does not mean that the risk of harm was not substantially increased by the asportation."

In *People* v. *Beamon* (1973) *supra,* 8 Cal.3d 625, 636, the defendant hijacked a liquor truck and was recognized by the driver. We described the ensuing events, and their importance in supporting an aggravated kidnaping conviction under *Daniels,* as follows: "There was present here by reason of the abduction a material increase in the risk that the victim would suffer significant physical injuries, as in fact he did. He was forced at gunpoint to lie on the floor of the cab of his truck as it was driven through city traffic. When he looked up he was informed that he would be killed. When he attempted to take positive action in an effort to save his life, he was beaten back with the butt of a gun. When the truck arrived at its apparent destination his abductor urged an armed accomplice to kill the victim while the latter was engaged in a life and death struggle. Only by taking desperate defensive action was the victim able to escape with his life. Obviously, the risk of harm to which he was exposed as the result of the abduction was substantially increased over and above that to which the victim of a robbery is normally exposed and the jury impliedly so found on proper instructions."

In *People* v. *Laursen* (1972) 8 Cal.3d 192 [104 Cal.Rptr. 425, 501 P.2d 1145], the defendant and a confederate robbed a food market but abandoned their getaway car when it failed to start. With a police officer in hot pursuit, the robbers captured a passerby, one Donald Teeter, and ordered him to drive them in his car to a place of safety. When the defendant took aim at the police officer with his gun, Teeter seized his arm and slammed on the brakes. A struggle ensued in which Teeter was shot in the hand. Teeter was then subdued and forced to continue driving, while the police officer fired five or six bullets into the escaping vehicle. Pointing out that "Fortuitously snatched as a hostage, Teeter was, as might reasonably be expected, wounded in the gun battle which occurred during the robbery," we concluded that the likelihood of such increased risk of harm was so clear as to warrant a conviction of aggravated kidnaping under *Daniels.* (*Id.* at pp. 199-200.)

In *People* v. *Ramirez* (1969) 2 Cal.App.3d 345 [82 Cal.Rptr. 665], the defendant and his confederate Laurent accosted their intended rape victim at 2:30 a.m. in a factory parking lot, dragged her into their car, and sped away. The police were alerted and a patrol car gave chase. As soon as the criminals realized they were being followed, their vehicle "took an erratic course." The victim protested there would be an accident and she would be killed, but the defendant ordered Laurent to drive even faster. The

police eventually forced the fleeing car to the side of the road, but Laurent made a sudden U-turn and drove off with the patrol car again in hot pursuit. Finally the vehicle in which the victim was riding overturned in a crash, and Laurent received fatal injuries. Affirming a conviction of kidnaping, the Court of Appeal reasoned (at p. 356) that "the manner of the detention and movement substantially increased the risk of harm to [the victim] over and above that necessarily incident to the crime of rape— the risk being so great that the driver of the car met his death as a result."

I have recited the facts of these cases to underscore their total absence from the record before us. Here the driver did not intentionally run stop signs or red lights in order to attract police attention; the kidnaper was not armed, did not brandish a gun and fire it through the windshield or at his victim; the victim made no desperate attempts to save herself while the vehicle was in motion; and there was no reckless, high-speed chase with the police in hot pursuit, pouring bullets into the car. On the contrary, defendant apparently drove Miss S.'s vehicle the short distance involved without the slightest untoward incident. According to the map, Tweedy and Dacosta are not busy thoroughfares but quiet backstreets. It was in defendant's interest to drive as discreetly as possible, so as to attract no attention from any passerby who might happen on the scene. It is true he steered with his left arm only, but Miss S. testified the car had an automatic transmission and hence required no shifting of gears. It is also true his right arm was holding onto Miss S., but there is not a word of testimony suggesting that at any time during the movement of the car she tried to break free of his grip or regain control of the vehicle; instead, she apparently remained wholly submissive by reason of fear. I conclude there is no showing that in the case of Miss S. her movement alone created a *substantial* increase in the risk that she might suffer *significant* physical injuries in an automobile accident.

In the case of Ottilia J. the defendant's method of "controlling" his victim while moving her to the place of the robbery was to order her to walk in front of him along the sidewalk for one block, warning her he had a gun in his hand.[9] What "grave risks of harm" did Mrs. J. thereby incur? The majority are still silent. Inasmuch as the movement took place

---

[9]Mrs. J. testified she was standing outside a tavern about midnight when "I heard a voice and felt something stick up against my thin blouse on the side . . . . The voice was a man's voice and he said, 'Start walking, lady; this is a gun, don't try anything; don't try anything; don't try nothing and you won't get hurt.' " With defendant staying close behind her, "I went straight down the sidewalk, behind the filling station and there was a bunch of parked cars right in there." She did not see either defendant's gun or his face until they entered the car he had selected.

on foot, there was no danger of injuries arising from an automobile accident or the motion of a recklessly driven car. It is true defendant was armed with a gun, and in the circumstances we may presume it was loaded. But there is no evidence he intended to shoot his victim in cold blood while walking her to the parked car. Thus defendant's sole purpose in pulling the gun on Mrs. J. must have been simply to compel her to do his bidding and dissuade her from escaping or calling for help. As he advised her in the classic vernacular of the holdup man, "don't try nothing and you won't get hurt."

Perhaps, therefore, the majority refer to a risk that Mrs. J. might nevertheless be shot because of some subsequent act on her part or by a third person. Several possibilities come to mind: (1) defendant might feel compelled to shoot her deliberately if she tried to disarm him, or escape, or raise an alarm; (2) even if defendant had no such intent, in any of the foregoing events a struggle might ensue in which Mrs. J. might be accidentally shot; or (3) that same consequence might follow if a passerby or police officer attempted to capture him or rescue her or call for help.

The insuperable difficulty with such hypotheses, however, is that Mrs. J. also faced each and every one of the foregoing risks at the very moment defendant accosted her on the sidewalk with a drawn gun. The danger that the victim might be intentionally or accidentally shot because of his panic or resistance or the intervention of a third person is, unfortunately, inherent in the commission of the crime of *armed* robbery. (Cf. *People* v. *Mutch* (1971) 4 Cal.3d 389, 397-398 [93 Cal.Rptr. 721, 482 P.2d 633] [pistol-whipping held a risk inherent in armed robbery].) Indeed, it is principally for this reason that the penalty for the crime is so severe. (*People* v. *Mutch, supra,* at p. 398, fn. 7.) Accordingly, during the brief movement following the confrontation in front of the tavern Mrs. J. did not incur the risk of any injuries " 'over and above those to which the victim of the underlying crime [i.e., robbery] is normally exposed.' " (*People* v. *Beamon* (1973) *supra,* 8 Cal.3d 625, 636.)[10] In my view, therefore, the movement does not amount to a violation of section 209 within the meaning of *Daniels.*

In any event, far more important than one man's opinion of the matter is the fact that a properly instructed *jury* could determine from this evidence that either or both the brief movements charged as kidnaping did

---

[10]The same result follows even if the majority are able to conceive of some remote way in which Mrs. J. risked being shot that is *not* inherent in the crime of armed robbery. In such event, I submit, the record would still show that the ensuing brief movement did not *substantially* increase that risk under *Daniels.*

not substantially increase the risk of harm within the meaning of *Daniels.* Once again, however, the majority deny the right of the jury to so find, holding (fn. 20, *ante,* pp. 768-769) that "as a matter of law" the movements *"did* substantially increase the risk of harm—and that there is no evidence [worthy] of consideration to the contrary." (Italics in original.) In the light of the facts and circumstances discussed at length herein, that conclusion is manifestly a distortion of the record.

In the case of Eileen S., for example, the majority in effect hold that a jury must necessarily find a *substantial* increase in the risk of harm every time a would-be robber moves his victim a few blocks by car while restraining her in such a manner that an automobile accident might conceivably occur. No such limitation can be found either in the statute or in *Daniels.* Nor will the proposal withstand analysis: under the majority's view the present defendant must be found guilty of aggravated kidnaping— but not an intended robber who renders his victim unconscious, or securely binds and gags her, before driving exactly the same distance. The contrast underscores the arbitrariness of the majority's reliance on the single element of "forcible control," rather than the totality of the circumstances placed before the jury, in determining whether the movements resulted in a substantial increase in the risk of harm.

In our unanimous decision in *In re Crumpton* (1973) 9 Cal.3d 463, 466 [106 Cal.Rptr. 770, 507 P.2d 74], we explained that "In *Daniels* we construed section 209 to preclude convictions based on movement of the victim that is criminologically insignificant." Contrary to the majority's assertion, there is here at least some slight evidence—"deserving of any consideration whatsoever"—from which a jury of 12 reasonable men and women could find, *if it chose to do so,* that the brief movements preparatory to robbery in this case had no criminological significance. Under *Sedeno, Tribble,* and their predecessors, defendant has the right to have a properly instructed jury make that determination.

I hold no brief for this defendant. Assuming, as we must, that he is sane, he comes before us as a vicious and depraved felon entitled to no sympathy but to the full measure of punishment that may lawfully be inflicted on him.[11] Nevertheless, we must not lose sight of the salutary

---

[11]That punishment is so severe, however, that the majority need not fear defendant will soon walk the streets again. Even if we were to send the two aggravated kidnaping counts back for a new trial with the simple kidnaping count, defendant would remain validly convicted on one count of first degree robbery, two counts of sex perversion in violation of Penal Code section 288a, one count of sodomy in violation of Penal Code section 286, and one count of second degree robbery. The first four

purpose of our landmark decisions in *Daniels* and its progeny: surely the fate of this single defendant is not more important than our continuing effort—in which the Legislature has now joined (see fn. 3, *ante*)—to bring reason, proportion, and consistency to the development of the law of kidnaping in California. It is my sincere hope that the future will prove the majority's ruling on the aggravated kidnaping counts in this case to be no more than a passing aberration unfortunately confirming the old adage that hard cases make bad law.

Tobriner, J., concurred.

**McCOMB, J.**—I concur in the majority opinion, except that, for the reasons expressed in my dissenting opinion in *People* v. *Anderson,* 6 Cal. 3d 628, 657 [100 Cal.Rptr. 152, 493 P.2d 880], I dissent from the modification of the death penalty. (See Cal. Const., art. I, § 27.)

Appellant's petition for a rehearing was denied July 25, 1974.

---

of these convictions carry life-maximum indeterminate sentences, and in view of the whole record I cannot believe the Adult Authority will release this man for many years to come.